Thomas P. **ATHRIDGE**, et al., **Plaintiffs**,

v.

**AETNA CASUALTY AND SURETY CO., Defendant.**

**No. CIV. A. 96–2708 (RMU/JMF).**

United States District Court, District of Columbia.

Sept. 17, 2001.

William Joseph Rodgers, Charles Belsome Long, Collier, Shannon, Rill & Scott, P.L.L.C., Washington, DC, for plaintiffs.

Lee H. Ogburn, Gertrude C. Bartel, Geoffrey H. Genth, Kramon & Graham, P.A., Baltimore, MD, for defendant.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

This matter is before me on *Defendant's Motion for Summary Judgment on Remaining Counts* and *Plaintiffs' Cross-Motion for Partial Summary Judgment on the Issue of Indemnification.* For the reasons set forth below, defendant's motion will be granted and plaintiffs' denied.

## I. BACKGROUND

On July 29, 1987, Jorge Iglesias ("Jorge"), age sixteen, entered the home of his aunt and uncle ("the Rivas") who were out of the country on vacation. He found the keys to their Volkswagen Jetta and took the car. While driving the Rivas's Jetta in the District of Columbia, Jorge struck and severely injured plaintiff, Thomas Athridge ("Tommy").[1] The accident generated a series of lawsuits.[2] Plaintiffs brought the present action against Jorge's insurer, Aetna Casualty and Surety Company ("Aetna"), asserting theories of indemnification, tortious conduct, and unfair trade practices.

The late Judge Harold Greene, while presiding over one of these lawsuits and after learning that Jorge was contemplating bankruptcy and the consequential discharge of a substantial judgment that had been awarded to Tommy, ordered Jorge to assign whatever rights he had against Aetna to Tommy. Thus, the current complaint combines claims Tommy makes on his own behalf as well as those he makes as Jorge's assignee.

In a Memorandum Opinion and Order dated March 2, 2001,[3] this Court entered summary judgment in favor of Aetna on count two of plaintiffs' amended complaint, breach of fiduciary duty and breach of the duty of due care, good faith and fair dealing. Plaintiffs' *Amended Complaint*

---

**1.** Plaintiffs are Thomas Athridge and his father. I will refer to the son who was injured as "Tommy" and to the plaintiffs collectively as "the Athridges."

**2.** For a thorough discussion of the factual circumstances surrounding the accident, see the Court of Appeals' decision, *Athridge v. Rivas,* 141 F.3d 357 (D.C.Cir.1998). For a discussion of the lawsuits arising from this accident and their disposition, see the earlier opinions of this court: *Athridge v. Iglesias,* No. CIV.A.89–1222, 2000 WL 1780273 (D.D.C. Nov.14, 2000); *Athridge v. Aetna Cas. & Sur. Co.,* 184 F.R.D. 200 (D.D.C.1998); *Athridge v. Aetna Cas. & Sur. Co.,* 184 F.R.D. 181 (D.D.C.1998); *Athridge v. Aetna Cas. & Sur. Co.,* No. CIV.A.96–2708, 1997 WL 732430 (D.D.C. Sept.23, 1997).

**3.** Reported at 2001 WL 214212 (D.D.C. March 2, 2001).

("Pls.Amend.Comp."), ¶ 29.[4] Aetna now moves for summary judgment on plaintiffs' remaining three counts: indemnification, intentional infliction of emotional distress and abuse of process, and unfair trade practices. The Athridges have filed a cross motion for partial summary judgment on the issue of indemnification.

## II. INDEMNIFICATION

In seeking summary judgment on the issue of indemnification, Aetna argues that it is not liable to plaintiffs because a policy exclusion operates to bar coverage in this case. Defendant's *Memorandum in Support of Defendant's Motion for Summary Judgment on Remaining Counts* ("Def.Mot.") at 10. In their cross-motion for summary judgment, the Athridges contend that: 1) the "reasonable belief" exclusion that Aetna relies on does not apply to named insureds and family members like Jorge, and 2) if the exclusion does in fact apply to named insureds and family members, the exclusion is void because it is contrary to the public policy expressed in D.C.'s No–Fault statute, D.C.Code §§ 35–2101 *et seq.* (2001 Supp.). Plaintiffs' *Cross Motion for Partial Summary Judgment on the Issue of Indemnification* ("Pls.Cross Mot.") at 3, 10.

### A. "Reasonable Belief" Exclusion

The first issue before me is whether Exclusion No. 11 of the Aetna policy, which precludes coverage for a vehicle used "without a reasonable belief that [the driver] is entitled to do so," applies to a

family member of the named insured operating the vehicle. The relevant provisions of the Aetna policy issued to Jorge's father, Jesus Iglesias, provide: [5]

### PART B. LIABILITY COVERAGE

We will pay damages for bodily injury or property damage for which any covered person becomes legally responsible because of an auto accident.

\* \* \*

"Covered person" as used in this Part means:

1. You or any family member [6] for the ownership, maintenance or use of any auto or trailer.

2. Any person using your covered auto.

\* \* \*

### EXCLUSIONS

We do not provide Liability Coverage:

\* \* \*

6. For any person while employed or otherwise engaged in the business or occupation of selling, repairing, servicing, storing or parking of vehicles designed for use mainly on public highways, including road testing and delivery. This exclusion does not apply to the ownership, maintenance or use of your covered auto by you, any family member, or any partner, agent or employee of you or any family member.

---

4. For simplification purposes, the Court has categorized the paragraphs of plaintiffs' amended complaint as counts. Of those counts remaining in this lawsuit, count one (¶ 28) seeks indemnification, count three (¶ 30) alleges willful abuse of process and intentional infliction of emotional distress, and count four (¶ 31) presses a claim for unlawful trade practices under the D.C. Consumer Protection Procedures Act, D.C.Code

§ 28–3905(k)(1). *Memorandum Opinion* of March 2, 2001 at 24.

5. *See* Def. Mot., Exhibit A.6.

6. "Family member" is defined by the policy as "a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child." Def. Mot., Exhibit A.6.

* * *

11. For any person using a vehicle without a reasonable belief that the person is entitled to do so.

The parties do not dispute that Jorge Iglesias is a "family member" of the named insured, Jesus Iglesias, and is therefore a "covered person" as defined by the policy. However, Aetna argues that the policy provides no coverage for Jorge Iglesias because Exclusion No. 11 bars coverage for *any person* using a vehicle without a reasonable belief of entitlement to do so, including family members like Jorge. Def. Mot. at 8. In their cross-motion for summary judgment, the Athridges argue that "named insureds and resident family members" are a distinct and mutually exclusive group from "any person" referred to in Exclusion No. 11. Pls. CrossMot. at 4. In other words, plaintiffs assert that Exclusion No. 11 applies only to persons other than the named insureds and resident family members.

■ Since jurisdiction in this case is based on diversity of citizenship, this issue must be decided in accordance with the District of Columbia law. *Keefe Co. v. Americable Intern., Inc.*, 219 F.3d 669, 670 (D.C.Cir.2000); *Bennett Enterprises, Inc. v. Domino's Pizza, Inc.* 45 F.3d 493, 497 (D.C.Cir.1995); *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C.Cir.1988). As the court of appeals stated in the latter case:

Plaintiffs nonetheless ask this court "to construct [a] market share approach" for DES daughter cases out of whole cloth, using for a pattern only bits and pieces of the decisions of courts in remote states. Judicial pioneers must no doubt make bold forays into terra incognita in order to chart the way to justice, but that is not the office of a federal court exercising diversity jurisdiction. Ours is the more modest challenge, faithfully to apply the law of the state

that the courts of the jurisdiction in which we sit, the District of Columbia, would apply had the case been filed with them. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). As the Supreme Court has made clear, "A federal court in a diversity case is not free to engraft onto those state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits." *Day and Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975); see also *Steorts v. American Airlines, Inc.*, 647 F.2d 194, 197 n. 32 (D.C.Cir.1981). Thus, we take the law of the appropriate jurisdiction as we find it; and we leave it undisturbed. *See Cantwell v. University of Massachusetts*, 551 F.2d 879, 880 (1st Cir.1977). As the First Circuit aptly expressed this fundamental rule of federal diversity jurisdiction:

Absent some authoritative signal from the legislature or the [state courts], we see no basis for even considering the pros and cons of innovative theories.... We must apply the law of the forum as we infer it presently to be, not as it might come to be.... [W]e see no basis for applying any rule other than the traditional one. *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 694–95 (1st Cir.1984) (footnotes omitted); see also *Answering Service, Inc. v. Egan*, 728 F.2d 1500, 1504 & n. * (D.C.Cir.1984).

851 F.2d at 423–424.

■ Thus, as I have taken pains to point out in this case, and particularly in my March 2, 2001 opinion, when there is no case directly on point in the precedents

of the District of Columbia Court of Appeals, the federal court is obliged to determine what result that court would reach given its existing precedents. The parties in this case, and the Athridges in particular, fail to comprehend that the absence of controlling precedent in the decisions of the District of Columbia Court of Appeals is not a license to find a case somewhere in the country that supports one's position and to demand its acceptance. As I also pointed out in my March 2, 2001 opinion, to do so would be to arrogantly resurrect the very "federal common law" that the Supreme Court put to rest in *Erie.* The sole emphasis has to be on what the District of Columbia Court of Appeals has done or would do.

■ There is another guiding principle, however, unique to the District of Columbia: in the absence of controlling precedent, courts interpreting the law of the District of Columbia look to the law of Maryland.[7]

■ Turning now to the exclusion at issue, whether one derives the holding from existing District of Columbia precedents or looks directly to Maryland law, the result is the same: the exclusion of a person who does not have a reasonable belief that he had permission to drive the car applies to a family member just as it does to anyone else.

■ First, as to existing District of Columbia precedents, the rules pertaining to the construction of insurance contracts are traditional:

"[W]here [insurance] contract language is not ambiguous, summary judgment is appropriate because 'a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence.' " *Byrd v.*

---

7. The District of Columbia Court of Appeals has explained why:

Since there is no District law on point, we should look to Maryland law first not only because the contract was executed there with a Maryland party, but also because the District of Columbia derives its common law from that state and because District of Columbia courts have in the past looked to Maryland law for guidance. The historical reasons for the application of Maryland law in the District of Columbia is explained in 24 Am.Jur.2d District of Columbia s 10 (1966) which states the following:

Under the terms of the acts of cession of territory by the states of Maryland and Virginia, to form the District of Columbia and of the congressional act of acceptance thereof, the laws of the two states respectively were to remain in force in the parts of the territory ceded by each until Congress should take upon itself the government of the District. The Act of Congress of February 27, 1801, which provided for the government of the District, declared that the laws of Maryland as they then existed, should continue and be in force in that part of the District which was ceded by that state, and a similar provision was made with respect to that part of the District that was ceded by Virginia. Consequently, the laws of Maryland as they existed in 1801 are in force in that part of the District which formerly belonged to Maryland, and since the act of retrocession by Congress to Virginia comprises the entire District of Columbia, subject to modifications by statutes of Congress, and as determined and developed by the courts of the District (footnotes omitted).

What this Court is stating is that since the remaining portion of the original District of Columbia does derive its common law from Maryland, and since the laws of Maryland as existed in 1801 may apply in the District (the law of Virginia not being applicable since the land it donated was retroceded to it), and since the law of Maryland has been looked to in the past for guidance, then it is appropriate in matters concerning the District 'for which there is no District of Columbia law, that the District of Columbia courts should look to the law of Maryland for guidance before it looks to the law of other states.

*Conesco Industries, Ltd. v. Conforti and Eisele, Inc.,* 627 F.2d 312, 315 (D.C.Cir.1980).

*Allstate Ins. Co.*, 622 A.2d 691, 693 (D.C. 1993) (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C.1983)). An insurance contract is not "ambiguous merely because the parties do not agree on the interpretation of the contract provision in question." *Id.* at 694 (citation omitted). Whether an insurance contract is ambiguous is a question of law which this court reviews de novo. *See Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C.1990).

III. Construction of Insurance Contracts

"An insurance policy is a contract between the insured and the insurer, and in construing it we must first look to the language of the contract." *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C.1999). [FN8] "Where insurance contract language is not ambiguous . . . a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *In re Corriea*, 719 A.2d 1234, 1239 (D.C.1998) (alterations and quotations omitted). "[U]nless it is obvious that the terms used in an insurance contract are intended to be used in a technical connotation, we must construe them consistently with the meaning which common speech imports." *Id.* (quotations omitted); see also *Cameron*, 733 A.2d at 968; *Washington v. State Farm Fire & Cas. Co.*, 629 A.2d 24, 27 n. 6 (D.C.1993). "[I]t is the insurer's duty to spell out in plainest terms—terms understandable to the man in the street—any exclusionary or delimiting policy provisions." *Cameron*, 733 A.2d at 968 (alterations and quotations omitted) (quoting *Holt v. George Washington Life Ins. Co.*, 123 A.2d 619, 621 (D.C.1956)). "Failing such unambiguous language, doubt should be resolved in favor of the insured." *Id.* (quotation omitted).

Since insurance contracts are written exclusively by insurers, courts generally interpret any ambiguous provisions in a manner consistent with the reasonable expectations of the purchaser of the policy. However, when such contracts are clear and unambiguous, they will be enforced by the courts as written, so long as they do not violate a statute or public policy. *Id.* at 968–69 (quoting *Smalls v. State Farm Mut. Auto. Ins. Co.*, 678 A.2d 32, 35 (D.C.1996)). Thus, the "first step in the construction of contracts is to determine 'what a reasonable person in the position of the parties would have thought the disputed language meant.'" *Id.* at 970 (quoting *District of Columbia v. C.J. Langenfelder & Son, Inc.*, 558 A.2d 1155, 1159 (D.C.1989)).

*Travelers Indem. Co. of Illinois v. United Food & Commercial Workers Intern. Union*, 770 A.2d 978, 985–986 (D.C.2001).

 Additionally, under District of Columbia law, words are to be given their "common, ordinary and . . . 'popular' meaning" and the "clear meaning will be adopted whether favorable to the insured or not." *Quadrangle Development Corp. v. Hartford Ins. Co.*, 645 A.2d 1074, 1075 (D.C.1994). Furthermore, a court is not to seek out ambiguities in an insurance contract. *Medical Service of the District of Columbia v. Llewellyn*, 208 A.2d 734, 736 (D.C.App.1965).

 Applying these principles to the policy at issue, I find that Exclusion No.11 is plain and unambiguous, and does apply to family members like Jorge Iglesias. Although the policy provides coverage for the named insured as well as his or her family members, the exclusion at issue denies coverage to *any person* using an automobile without a reasonable belief that he or she is entitled to do so. While the policy does not define the term "any person," the common, ordinary meaning of the phrase is all persons, which necessarily

includes the named insured and his family members. Terms will be deemed unambiguous where a court can "determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends ..." *Smalls v. State Farm Mutual Auto. Ins. Co.*, 678 A.2d 32, 35 (D.C.1996)(finding policy exclusion for "any bodily injury to any insured or any member of insured's family ..." clear and unambiguous, and containing no technical terms or words of art). The literal language of Exclusion No. 11 states that coverage is not extended to any person who uses a car without a reasonable belief he is entitled to do so.

In this context, the holding in *Smalls* is crucial. It is inconceivable to me that the court which held that the words "any insured or any member of insured's family" were not ambiguous would find the words "any person" ambiguous. I therefore have to conclude that the District of Columbia Court of Appeals, following its general principles of insurance contract interpretation and more particularly the reasoning of its decision in *Smalls*, would find the words "any person" to apply universally to everyone, including a family member. The exclusion, therefore, applied to Jorge.

To state the conclusion somewhat more broadly, I do not see how any reasonable person would have read this insurance contract the way Athridges read it. First, there is the structure of the insurance contract.[8] On page 1, part A, the paragraph identified in the margin as "Liability Coverage" states that "We will pay damages for bodily injury or property damage for which any covered person becomes legally responsible because of an auto accident." That same paragraph then defines a "covered person" to mean "You or any

family member for the ownership, maintenance of use of any auto ..."

The paragraph on the next page, identified in the margin as "Exclusions," begins with the words "We do not provide Liability Coverage" and then lists 12 exclusions. Thus, the phrase "We do not provide Liability Coverage" is a perfect cross-reference to the section entitled "Liability Coverage" on the first page. The only natural reading of the two paragraphs is that the insured and her family members are covered unless they do something within the exclusions, i.e., they have "liability coverage" unless they do something which brings them within the exclusions. For those events named as exclusions, the contract states that "We [the insurance company] do not provide Liability Coverage."

Additionally, of the 12 exclusions, 9 begin with the words "For any person." I find it inconceivable that a person reading these exclusions would wonder whether that meant that a family member who fell within them was covered, despite the use of the words "any person." To the contrary, I am certain that anyone who read the policy would conclude that "any person" meant the universe, including family members. That, after all, is the meaning of the words "any person."

Note also that Exclusion No. 6 of the Aetna policy states: "This exclusion does not apply to the ownership, maintenance or use of your covered auto by *you, any family member*, or any partner, agent or employee of yours or any family member." (Emphasis added). Exclusion No. 10 states: "For the ownership, maintenance or use of any vehicle, other than your covered auto, which is owned by or furnished or available for the regular use of any family member." No other policy exclusion, including Exclusion No. 11, con-

---

8. The contract is Exhibit A to Def. Mot.

tains such a limit on the term "any person" or uses the words "family member." The only fair reading of the exclusions by the policy holder is that, when Aetna wanted to speak to the significance of the use of a covered or non-covered auto by a family member, it did so. To say that the policy holder would nevertheless wonder whether Exclusion No. 11, which was silent as to the use of the covered auto by a family member, might or might not include a family member ignores how the rest of the exclusions deal with a family member. They explicitly use the words "family member" when the exclusions turn on use by a family member. The contrary reading would have required Aetna to repeat again and again the significance of each exclusion (other than Nos. 6 and 11) for a family member when no ambiguity existed as to whether or not a family member was within the exclusion because each exclusion repeated the universal words "any person."

If one went at the problem more directly, and, in the absence of controlling or dispositive precedent, looked to the law of Maryland, the answer is clear: the Court of Special Appeals of Maryland has concluded that the very words at issue here are not ambiguous. It therefore followed that a family member who did not have a reasonable belief that he was entitled to drive the car was excluded from coverage. *General Accident Fire & Life Assurance Corp. v. Perry*, 75 Md.App. 503, 541 A.2d 1340 (Md.Ct.Spec.App.1988).

In that case, the contractual language at issue was identical to the language at issue here. In *Perry*, a "covered person" meant "you or any family member." The policy also provided, however, that "We do not provide Liability Coverage for any person using a vehicle without a reasonable belief that the person is entitled to do so." The court then held that there was no ambiguity created by insurance company in the manner in which it used the terms "family member" and "any person" in the policy exclusion just quoted and therefore there was no reason to invoke the principle that any ambiguity be construed against the insurance company.[9] Instead, the exclusion for "any person" driving without a reasonable belief that he was entitled to do so was unambiguous and therefore included a family member who lacked such a belief.

I, therefore, conclude to a certainty that, in the absence of controlling precedent in this jurisdiction, the District of Columbia Court of Appeals would follow the *Perry* case and conclude that Exclusion No. 11 precludes coverage for any person, including a family member, who uses a vehicle without a reasonable belief that he is entitled to do so. I therefore must grant Aetna summary judgment as to that issue either because (a) the District of Columbia Court of Appeals's own precedents would lead it to conclude that the words "any person" are not ambiguous and that the natural, reasonable reading of the coverage and exclusion sections of the contract means that a family person is excluded from coverage if he lacks a reasonable belief that he is entitled to drive a car or (b) in the absence of controlling precedent, the District of Columbia Court of Appeals would follow the *Perry* case and reach the same conclusion as the *Perry* court did.

---

**9.** The Athridges attempt to escape from the *Perry* case by arguing that Maryland does not follow the principle that ambiguities in an insurance contract are to be construed against the draftsmen while the District of Columbia does. But, as the *Perry* case specifically indicates, Maryland unquestionably follows that principle. The law of the two fora is identical in that respect. *Compare Perry*, 541 A.2d at 1340 *with Smalls*, 678 A.2d at 34.

## B. D.C.'s Compulsory/No–Fault Act

The Athridges next argue that if Exclusion No. 11 precludes coverage for all persons using a vehicle without a reasonable belief of entitlement, including the named insured and his family members, this exclusion is void as contrary to D.C.'s Compulsory/No–Fault Act ("the Act"), D.C.Code §§ 35–2101 *et seq.* (2001 Supp.). Pls. Cross Mot. at 9–11. Specifically, the Athridges argue that if the reasonable belief exclusion is construed to include family members, it would operate to deny third-party liability coverage mandated by the Act. *Id.* at 10. Where contracts are clear and unambiguous, courts will enforce them as they are written, provided they do not "violate a statute or public policy." *Smalls v. State Farm,* 678 A.2d at 35 (*citing Robinson v. Aetna Life Insur.,* 288 A.2d 236, 238 (D.C.1972)). Therefore, unless I conclude that Exclusion No. 11 violates D.C.'s No–Fault Act, it will continue to operate to exclude Jorge Iglesias from coverage if he used the Rivas's vehicle without a reasonable belief that he was entitled to do so.

D.C.'s No–Fault Act requires D.C. residents to maintain, among other things, third-party liability coverage of at least $25,000 per person and at least $50,000 for all persons injured in any one accident. D.C.Code §§ 35–2103(a), 35–2106(c); *Smalls,* 678 A.2d at 34. The stated purpose of the No–Fault Act is to "provide adequate protection for victims who are injured in the District or who are injured while riding in motor vehicles registered or operated in the District." D.C.Code § 35–2101(b).

Since nothing in this case is simple, the legal issue presented must be examined in the factual context of this case and the claim the Athridges assert.

First, as noted above, Judge Greene awarded Tommy damages in the amount of $5,510,000.78. Second, the policy Aetna provided the Iglesias family provided $300,000 in liability coverage, i.e., liability imposed upon the insured by a third party. Third, District of Columbia law permits an insured to purchase uninsured motorist protection which protects a person when he is injured by an uninsured motorist by providing him with insurance protection irrespective of fault. Thus, in the District of Columbia, if one is injured by an uninsured motorist and has opted for this kind of coverage, one recovers the policy amount from one's own insurance company. Fourth, we know that the Athridges had such coverage through the Amica Mutual Insurance Company for the policy is Exhibit D to *Defendant's Reply Memorandum in Further Support of Motion for Summary Judgment Based on the Applicability of Exclusion No. 11 of the Pertinent Insurance Policy* ("Def.Reply"). Fifth, we also know from the discovery in this case that in 1991, when the Athridges were represented by another lawyer, Joseph Koonz, Koonz urged them to consider seeking recovery under the uninsured motor provisions of their own policy. Since the Superior Court had concluded that neither Aetna nor GEICO [10] had any responsibility to defend or indemnify Jorge, Koonz feared that the Athridges's recovering on their own policy was their only hope. Exhibit B to *Memorandum in Support of Defendant's Motion for Summary Judgment on Remaining Counts.*

We also know that in 1991, Koonz (before the Athridges fired him) applied on the Athridges' behalf for the coverage provided the Athridges by the Uninsured Motorist Provision in the Athridges's own policy. Def. Reply, Exhibit E. At that point,

---

**10.** GEICO insured the Rivases who owned the car Jorge drove. Aetna insured the Iglesias.

the trail runs cold; we do not know what happened thereafter.

Finally, in this case, the Athridges seek indemnification "for the damages they have suffered arising from the negligent use by Jorge Iglesias of a motor vehicle in the United States on July 29, 1987 as found by the Court in Civil Action No. 89–1222." Thus, in their "Demand for Relief," the Athridges seek compensatory damages from Aetna in the amount of the damages awarded by Judge Greene, i.e ., $5,510,000.78. Because the Athridges seek indemnification and are otherwise strangers to the contract between Aetna and Jorge, they have to claim Jorge's right to indemnification as his assignee.

When all this is considered, the question seemingly presented is whether the exclusion from liability coverage of a person who lacks a reasonable belief that he is entitled to drive a car is void against public policy because it conflicts with the District of Columbia No–Fault Law when the victim has his or her own Uninsured Motorist Coverage? I say seemingly because the Athridges' demand makes the real question whether the insured can recover from his liability insurer an amount at least ten times greater than the coverage of his own policy because the policy's exclusion of him is unenforceable due to the No–Fault Insurance law?

■ First of all, holding Aetna responsible for more than $5 million dollars in "indemnification" when Aetna's policy limit is $300,000 is irrational. The purchaser of insurance can reasonably anticipate that he will be tendered a defense or indemnified to the limits of the policy. In a No–Fault state, the insured's victim can reasonably expect that the insured is carrying a liability policy in at least the amount required by the No–Fault statute, which in the District is $25,000. D.C.Code § 2106(c). Assuming that an exclusion violates a No–Fault insurance law, paying the insured or the insured's assignee ten times the policy's limit, and several more times the amount required by the No–Fault law, punishes the insurance company for the exclusion it created in a manner that is beyond all comprehension and fairness. It is one thing to hold an insurance company liable for the judgment against its insured when it denies him coverage in bad faith. It is another to hold an insurance company liable for ten times the policy limit in "indemnification" when the policy limit is $300,000 and when the insurance company's only "wrong" is to create an impermissible exclusion of liability in a No–Fault jurisdiction where the victim's maximum recovery under the No–Fault statute could be as little as $25,000, the statutory amount. No court in the country, let alone one in the District of Columbia, has ever punished an insurance company for incorporating an allegedly impermissible exclusion from No–Fault coverage, let alone in the manner in which the Athridges seek to punish Aetna. There is no warrant in law whatsoever for the extraordinary result the Athridges seek.

Additionally, the controlling case in the District of Columbia, *Smalls*, teaches that if an exclusion from coverage violates the No–Fault statute the insurance contract will be deemed to provide the victim with no more than the statutory minimum amount which the insured is required by law to carry.

In *Smalls*, Mrs. Smalls was driving the car with her husband as passenger. She hit a tree and was injured. Her husband, however, died. When their children sued her, alleging her negligence caused their father's death, their insurance carrier, State Farm, refused coverage relying on an exclusion in the policy for "any bodily injury to ... any insured or any member

of an insured's family residing in the insured's household." 678 A.2d at 34. The D.C. Court of Appeals held, however, that this exclusion was inconsistent with the No–Fault statute because it created a gap in insurance coverage in violation of the policy of the No–Fault statute that there be no such gaps. It then concluded, however, that although the exclusion conflicted with the No–Fault Act, "it is invalid only to the extent of that conflict." The court stated:

> We agree with the trial court that, although the household exclusion clause conflicts with the No–Fault Act, it is invalid only to the extent of that conflict. Generally, parties are free to enter into whatever contractual agreements they wish. That freedom is curtailed by the courts only when such contracts, or contractual provisions, run contrary to public policy. *Wisconsin Avenue Associates v. 2720 Wisconsin Avenue Cooperative Ass'n,* 441 A.2d 956, 964 (D.C.), cert. denied, 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64 (1982). As State Farm notes in its brief, household exclusion clauses are not invalid in and of themselves. The principal purpose of such clauses is usually to protect insurers against collusive lawsuits. Because this is a legitimate goal, household exclusion clauses have been upheld by the courts of many states when they have not been in conflict with statutory requirements. In the present case, we hold that as long as the minimum insurance requirements of section 35–2106(c) are met, the household exclusion clause in Mr. Smalls' policy, limiting further third-party liability above and beyond the statutory minimum, is not inconsistent with the Act's remedial purpose.

*Smalls,* 678 A.2d at 36.

The court therefore affirmed the trial court's determination that the Smalls children's maximum recovery could therefore be no greater than the No–Fault statutory minimum, which was $50,000 in that case and is $25,000 in this case.

It is therefore the law of the District of Columbia that the victim may recover up to the No–Fault statutory minimum if the exclusion of coverage upon which the insurer relies is found to be inconsistent with the No–Fault statute. Obviously, the Athridges' demand for $5 million dollars for Aetna because of the asserted inconsistency between the "reasonable belief" exclusion and the No–Fault Statute is impermissible as a matter of District of Columbia law.

If the Athridges should move to amend their complaint to seek, as Jorge's assignees, the reformation of the contract and demand the statutory minimum of $25,000, the question of whether the reasonable belief exclusion is inconsistent with the No Fault statute arises. The cognate question is whether the Athridges' own Uninsured Motorist policy would make the *Smalls* case inapplicable because the availability of that policy to the victim eliminates the insurance gap which motivated the *Smalls* decision. But, the Athridges have not filed such a complaint, and it is improper for me to consider those questions unless and until they do. Indeed, doing so might be unfair to the Athridges. I should not impute to them a desire to seek no more than the statutory amount from Aetna and resolve legal questions on that assumption. They may not wish to do so, and they also may wish to consider the significance of seeking such a recovery from Aetna in lieu of coverage under their own Uninsured Motorist insurance policy.

The complications created for the Athridges by the *Smalls* case have a significant effect upon the resolution of whether the exlcusion does or does not apply to Jorge's driving the car. Aetna insists, or

course, that there is no genuine issue of material fact that Jorge had a reasonable belief that he was entitled to drive the car and it is entitled to summary judgment on that basis. But, that legal issue does not arise unless and until the Athridges determine what position they will take as to the exclusion. If the Athridges were to specifically claim that the reasonable belief exclusion violates the No–Fault statute, their maximum recovery would be $25,000. This would be based on the assumption that they convince a court that (a) the reasonable belief exclusion does violate the No–Fault statute and (b) the Athridges's ownership of an Uninsured Motorist policy does not render the *Smalls* case inapplicable. Obviously, if the Athridges ultimately claim that the exclusion is invalid under the No–Fault statute and seek the $25,000 *Smalls* may permit them, and if a court agrees with them despite their ownership of their own Uninsured Motorist policy, the exclusion disappears from this case and Aetna will have to pay them that amount as Jorge's assignees whether or not Jorge did or did not have a reasonable belief he was entitled to drive the car. That claim would certainly not entitle the Athridges to the $300,000 liability amount of the Aetna policy, let alone the $5 million they seek.

Unless and until the Athridges press that or some other contention, however, it can be said without fear of contradiction that their claim for $5 million because of the alleged inconsistency between the reasonable belief exclusion and the No–Fault statute is utterly insufficient as a matter of District of Columbia law and must be dismissed.

## III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND ABUSE OF PROCESS CLAIMS

Aetna also moves for summary judgment on plaintiffs' tort claims of intentional infliction of emotional distress and abuse of process (Count 3).

The second count of the Athridges' complaint sets forth a cause of action premised on Aetna's breach of fiduciary duty to its insured. My opinion of March 2, 2001 dealt at length with this count. Confronted with an absence of controlling authority as to whether an insured could predicate an action against his insurer upon a tort of bad faith, I determined that in order to be consistent with the *Erie* obligation I have and which I have explained in this opinion I would review the actions claimed to have been done in "bad faith" and first ascertain whether Aetna breached its insurance contract with Jorge because it defeated any expectation the purchaser would have when she purchased the insurance contract. I would then see if those same actions by Aetna would be deemed in bad faith, warranting recovery in tort, in the jurisdictions in which the tort existed and on whose case law the Athridges relied. *Athridge v. Aetna Cas. & Sur. Co.*, 2001 WL 214212 at * 4.

I then reviewed at length and in detail the actions about which the Athridges complained and concluded that they neither breached any contractual responsibility Aetna had to Jorge nor constituted "bad faith" in the jurisdictions which recognized that tort.

Since I had so concluded, I was obviously concerned by the Athridges's continued assertion that these very same actions could nevertheless serve as the premises of their claims of Aetna's intentional infliction of emotional distress and abuse of process by Aetna. I therefore specifically directed the parties to address whether, under D.C. law, Aetna can be held responsible for intentional infliction of emotional distress or abuse of process in light of this court's decision that Aetna violated no duty it owed Jorge in the manner in which

it has conducted itself in this lengthy litigation. It is clear that the Athridges cannot satisfy the burden I imposed upon them.

## A. Intentional Infliction of Emotional Distress

 The tort of intentional infliction of emotional distress requires a showing of: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.' " *Crowley v. North American Telecomms. Ass'n,* 691 A.2d 1169, 1171 (D.C.1997)(*quoting District of Columbia v. Thompson,* 570 A.2d 277, 289–90 (D.C.1990), *cert. denied,* 502 U.S. 942, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991)). The D.C. courts have stated that in order to warrant liability for intentional infliction of emotional distress, defendants' conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Howard University v. Best,* 484 A.2d 958, 986 (D.C.1984)(*quoting Jackson v. District of Columbia,* 412 A.2d 948, 957 (D.C.1980)). "The requirement of outrageousness is not an easy one to meet." *See, e.g., Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C.1994); *Bown v. Hamilton,* 601 A.2d 1074, 1080 (D.C.1992). The Athridges do not explicitly discuss their claim of intentional infliction of emotional distress in their opposition to defendant's motion for summary judgment as to the remaining claims and therefore never explain to me how behavior I have found to be neither in violation of a contract nor tortious can nevertheless "go beyond all possible bounds of decency." Clearly, they cannot. I have again reviewed the acts complained of and again find no basis upon which a reasonable finder of fact could conclude that Aetna's acts meet this stringent, demanding standard.

## B. Abuse of Process

 Plaintiffs also assert a claim of abuse of process against Aetna. This tort requires a showing that the legal system "has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do." *Morowitz v. Marvel,* 423 A.2d 196, 198 (D.C.1980) (citation omitted). Merely filing a lawsuit or initiating the legal process is not actionable, regardless of the ulterior motive behind the process. "Proper use of the machinery of the law, though with an improper motive, is not tortious; only when the process is used to accomplish some end outside of its regular purview does a cause of action arise." *Goodall v. Frank R. Jelleff, Inc.,* 130 A.2d 781, 782 (D.C.Mun.App.1957).

 That the process was used to accomplish some purpose other than the successful end of the lawsuit itself is crucial to the tort. As Prosser and Keeton explain in the leading English case, the defendant had the plaintiff arrested to compel him to surrender under duress the register of a vessel without which the plaintiff could not go to sea. Although malicious prosecution would not lie because the proceeding against the plaintiff had not been terminated, the court refused to let its process be misused. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 121, at 897 (5th ed.1984). It therefore follows:

> Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process

to its authorized conclusion, even though with bad intentions.

Id. at 898.

 In its motion for summary judgment, Aetna argues that the evidence in this case establishes that Aetna did not misuse the process to achieve an improper end. Def. Mot. at 11. Aetna points to this court's prior determination that Aetna's filing the D.C. declaratory judgement action was a legitimate pursuit of a determination of its rights and duties in this case. *Id.* Aetna also argues that contrary to the Athridge's assertions that Aetna willfully decided not to join the Athridges in the declaratory action, the Athridges actually "elected not to intervene" in the action. *Id.*, n. 10.

The Athridges contend that an insurer's filing of a declaratory judgment action is not sufficient to "negate liability for wrongful conduct." Plaintiffs' *Memorandum of Points and Authorities in Opposition to Aetna's Third Motion for Summary Judgment on Issues Other than Indemnification* ("Pls.Opp.Issues") at 3. They claim that Aetna filed a declaratory action on coverage, expecting Jorge to default. They then claim that Aetna used that default to "dissuade the injured Plaintiff from pursuing the proceeds of insurance" that is mandated by D.C.'s No–Fault Act. *Id.* at 5. The Athridges further allege that Aetna willfully decided not to join the Athridges in the Superior Court action as Aetna was allegedly required to do by D.C. Superior Court Rule 19, and further failed to explain why the Athridges were not joined. *Id.* at 5–6. Finally, the Athridges contend that Aetna used the improperly obtained default judgment to withdraw from its representation of Jorge in 89cv1222. *Id.* at 7–8; Pls. Amend. Comp. at 11. Thus, plaintiffs conclude that "a jury is obviously entitled to find that Aetna's actions were

guided by 'an ulterior purpose' " and that Aetna's purpose in filing the declaratory judgment action and "willfully defying the rules of joinder" constitute an improper use of process. Pls. Opp. Issues at 9.

Because I have already concluded that Aetna did not breach any duty it owed to Jorge in seeking the declaratory action, *Memorandum Opinion* of March 2, 2001 at 24, I am unpersuaded by the Athridges' assertion that Aetna's pursuit of the declaratory action was somehow improper or outside the regular purview of process. Just as plaintiffs failed to establish evidence supporting its claim of breach of duty of due care with respect to the declaratory judgment action, they offer no evidence to support their abuse of process claim vis-a-vis the Superior Court action. Merely filing the declaratory action, regardless of motive, is alone insufficient to establish a claim of abuse of process. *Goodall*, 130 A.2d at 782. Absent a showing that Aetna used the declaratory action to accomplish an end not regularly or legally obtainable, liability will not lie. During the litigation that arose from the accident, all the actions Aetna took were intended to first escape coverage and liability. Once that was accomplished, Aetna paid for a lawyer who tried to defeat Tommy's claim against Jorge on its merits. Escaping coverage and trying to defeat Tommy were perfectly legitimate actions for Aetna, an insurance company, to take. To permit these actions to be the premise of liability expands the tort of abuse of process beyond recognition.

As this case shows, there can be no other rule. If every litigant could use his opponent's activities in litigation as the premise of a second action, litigation would never end because in every lawsuit there would be the seeds of a second lawsuit. Litigation would become like the Russian

Doll in which there is a Russian Doll in which there is a Russian doll *ad infinitum.*

I must also say that I find the Athridges's assertion that Aetna willfully decided not to join the Athridges in the declaratory judgment action to be particularly troubling. The Athridges know that I have seen documents during discovery which I determined to be privileged that show that Mr. Athridge, an attorney himself, was warned by Koontz, his lawyer, to participate in one or more of the Superior Court actions brought by Aetna and GEICO, but that Mr. Athridge made the decision not to have Tommy intervene or participate.[11] The Athridges cannot use the privilege as a shield against what they know to be the truth. *See SEC v. Lavin,* 111 F.3d 921, 933 (D.C.Cir.1997). In light of those documents, their accusation of Aetna's "failing to join them" in the Superior Court actions rings awfully hollow.

## IV. UNLAWFUL TRADE PRACTICES

 Finally, Aetna also moves for summary judgment on plaintiffs' claim that Aetna's actions constitute unlawful trade practices in violation of the D.C. Consumer Protection Procedures Act, D.C. § 28–3905(k)(1). In paragraph 23 of the complaint, the Athridges list 10 material facts which they accuse Aetna of either failing to disclose or misrepresenting to Jorge, the Athridges' assignor. While their compliant is not specific, they must be relying on D.C.Code subsections § 28–3904(e) and (f). Under those two subsections, it is a violation of the Act for any person to: (e) misrepresent as to a material fact which has a tendency to mislead and (f) fail to state a material fact if such failure tends to mislead.

 The facial breadth of the statute has caused three judges of this Court to conclude that, under District of Columbia law, to wit, the decision in *Howard v. Riggs Nat'l Bank,* 432 A.2d 701 (D.C.1981), the Act only supplies consumers with a cause of action against merchants selling them goods or services. There must therefore be a consumer-merchant relationship in a consumer transaction involving the sale of goods or services. *Slaby v. Fairbridge,* 3 F.Supp.2d 22, 27 (D.D.C. 1998); *Armstrong v. Accrediting Council for Continuing Education and Training, Inc.,* 832 F.Supp. 419, 424 (D.D.C.1993); *Independent Communications v. MCI Telecommunications,* 657 F.Supp. 785, 786–788 (D.D.C.1987). At no point, however, was there ever a consumer merchant relationship between the Athridges' assignor, Jorge, and Aetna. Jorge never bought or attempted to buy anything from Aetna; his parents did. Moreover, the misrepresentations and omissions charged in paragraph 23 did not take place incident to an exchange of goods or services for money. To the contrary, they were uttered or concealed well after the sale of the insurance policy to Jorge's parents when Aetna was trying to establish in court that it had no responsibility to defend or indemnify Jorge at a time when Jorge was represented by his own counsel, Irving Starr. The Consumer Protection Procedures Act, which deals only with the merchant-consumer relationship under District of Columbia law, cannot possibly be stretched beyond recognition to reach statements made or not made by an insurance company engaged in litigation against its insured to establish that it is not obliged to represent or indemnify him.

---

**11.** The decision was a wise one. Judge Greene would ultimately hold that the Superior Court actions did not have a *res judicata* or *collateral estoppel* effect on the Athridges because the Athridges did not participate in those actions.

Additionally, it is also the law of the District of Columbia that a damage action under this Act requires a showing that the consumer suffered actual damages because of the misrepresentation or omission claimed to violate the Act. *Osbourne v. Capital City Mortgage Corp.*, 667 A.2d 1321, 1329–1330 (D.C.1995). Jorge, an impecunious high school dropout, obviously suffered no damages by virtue of any of the misrepresentations or omissions charged in the complaint. He has never paid a penny of Judge Greene's damage award and it has now been discharged in bankruptcy. His parents paid Irving Starr, the lawyer who represented him. Thus, Jorge suffered no actual damages from anything Aetna is said to have done to him or failed to tell him. The Athridges's complaint, based on its assignment from him, therefore fails as a matter of law even if the Act was applicable to the relationship between Aetna and Jorge.

## V. THE DIPLOMATIC RELATIONS ACT

Under the Diplomatic Relations Act, as amended, the members of a foreign mission and their families must carry liability insurance. 22 U.S.C.A. § 254e (1988). The complaint charges that Jesus, Jorge's father, is a citizen of Spain and a member of a foreign mission under the Diplomatic Relations Act. Complaint, ¶ 21(a). The only evidence in this record is to the direct contrary. On October 23, 1997, Dario Polo, Counselor for Economic and Administrative Affairs, of the Embassy of Spain wrote to Aetna's counsel:

> I am responding to your inquiry of October 10, 1997, regarding the status of Mr. Jesus Iglesias, an employee of the Spanish Embassy.
>
> After consulting our personnel files, we have concluded that Mr. Jesus Iglesias was a Legal U.S. Permanent Resident and a member of the "service staff" in 1986, when he was first hired, and has

continuously hold [*sic* ] that status until the present. Therefore, he is not and has not been subject to diplomatic privileges or immunity.

Def. Reply, Exhibit F.

Under the Vienna Convention on Diplomatic Relations, Article 37, ¶ 3, members of the service staff are entitled to immunity only if they are not permanently resident in the United States. Def. Reply, Exhibit G at 9. Since Jesus was a permanent resident, he did not have diplomatic immunity and neither he nor his family were subject to the mandatory liability insurance requirements of the Diplomatic Relations Act. The Athridges' reliance on that Diplomatic Relations Act as a premise of liability upon Aetna is therefore misplaced.

## CONCLUSION

For the reasons stated in this Memorandum, *Defendant Aetna's Motion for Summary Judgment* will be granted and *Plaintiffs' Motion for Partial Summary Judgment on the Issue of Indemnification* will be denied. By separate order I will enter final judgment in Aetna's favor.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby,

**ORDERED** that *Defendant Aetna's Motion for Summary Judgment* [# 172] is **GRANTED**. It is further, hereby,

**ORDERED** that *Plaintiffs' Motion for Partial Summary Judgment on the Issue of Indemnification* [# 179] is **DENIED**. Finally, it is hereby,

**ORDERED** that **FINAL JUDGMENT** is **ENTERED** in favor of Aetna.

**SO ORDERED.**