**Rodney BYRD, Appellant,**

v.

**Tina JACKSON, as Personal Representative of the Estate of Hattie Mae Smith, Appellee.**

No. 04–CV–940.

District of Columbia Court of Appeals.

Argued May 5, 2006.

Decided July 6, 2006.

Vere Owen Plummer, with whom Mark Hessell was on the brief, for appellant.

Elizabeth L. Mitchell, Washington, with whom Edward C. DuMont and James T. Sugarman were on the brief, for appellee.

Before FARRELL and KRAMER, Associate Judges, and VINCENT, Associate Judge, Superior Court of the District of Columbia.*

FARRELL, Associate Judge:

Plaintiff-appellee, the grandchild and personal representative of the estate of the deceased Hattie Smith, brought suit against appellant (Byrd) for his conduct in persuading Smith to sign documents which resulted in the sale of her home to a partnership Byrd controlled. After a bench trial, the judge found that Byrd had committed multiple violations of the Dis-

trict of Columbia Consumer Protection Procedures Act, D.C.Code §§ 28–3901 *et seq.* (2001) (the CPPA or the Act), and awarded treble and punitive damages to the estate. The judge found, in essence, that despite representing himself to Smith as a foreclosure specialist who would assist her in retaining ownership of her home, Byrd "orchestrat[ed] ... the sale of [her] property worth $200,000" to the partnership he controlled for $33,000, then "flip[ped] the property to [a third person] for $150,000 from which Byrd would take substantial money." [1]

■ On appeal, Byrd's primary contention is that the judge erred in concluding that the CPPA even applied to his transaction with Smith. He maintains that, whereas the Act presupposes the existence of a merchant-consumer relationship, *see, e.g., Howard v. Riggs Nat'l Bank,* 432 A.2d 701, 708–09 (D.C.1981); *Athridge v. Aetna Cas. & Sur. Co.,* 163 F.Supp.2d 38, 55, *aff'd in part, rev'd in part,* 359 U.S.App. D.C. 22, 351 F.3d 1166 (2003), there was no evidence that Smith understood him to be dealing with her as a merchant[2] to a consumer.[3] Instead of an agreement on his part to provide services to help Smith avoid foreclosure, Byrd contends that the evidence showed only "a purchaser-seller relationship" (Br. for App. at 17) in which Smith, in an arm's length transaction, sold her house to him in circumstances admittedly unfavorable to her but not of his making. Whatever claims Smith may have

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

1. Indeed, the judge found that ultimately Byrd had paid Smith nothing for the property.

2. The Act defines a "merchant" as "a person who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or

would be the subject matter of a trade practice." Section 28–3901(a)(3). A "trade practice" means, *inter alia,* "any act which does or would ... make available ... or offer for ... sale ... consumer goods or services." Section 28–2901(a)(6).

3. A consumer is "a person who does or would purchase, lease (from), or receive consumer goods or services...." Section 28–3901(a)(2).

had against him, Byrd concludes,[4] they did not lie under the CPPA because he offered no services to her in the role of merchant, as distinct from buyer.

■ The record does not support this argument. The judge's finding that, throughout the transaction, Byrd presented himself to Smith as a "foreclosure specialist" who would aid her in keeping her home—and not as a prospective buyer—may not be disturbed "unless ... plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001). Byrd argues initially, however, that the CPPA does not apply to his actions because a merchant-consumer relationship must be shown by a written agreement evidencing that Smith retained him to provide foreclosure-avoidance services or, at the least, by proof that she paid him for such services, and there was no evidence of either. But the Act imposes no such requirements. As footnoted at the outset, it defines a "merchant" to include one who *"would* sell ... consumer ... services"; a "consumer" as one who *"would* purchase" such services; and a "trade practice" as any act which *"would* ... make available ... or offer for ... sale ... consumer ... services" (emphases added). If, for example, Byrd falsely "advertise[d] or offer[ed]" his services to Smith as a foreclosure-avoidance specialist "without the intent to sell them ... as advertised or offered," D.C.Code § 28–3904(h), he violated the Act whether or not he entered a formal contractual relationship with her or received money for the services. *Cf. Sherman Simon Enters., Inc. v. Lorac Serv. Corp.*, 724 S.W.2d 13, 15 (Tex.1987) ("The language [in Texas's deceptive trade statute] clearly indi-

cates that a claimant can be a consumer ... even if the transaction is not consummated since a consumer is defined as 'a [person] who *seeks* or acquires ... goods ....'" (emphasis by court)); *Bohls v. Oakes*, 75 S.W.3d 473, 479 (Tex.App.2002) (rejecting defendant's argument that plaintiffs "were not consumers because there was no ... written agreement ... [or] transfer of goods or services founded on valuable consideration ... [or] evidence of a purchase or payment for services" (internal quotations omitted)).

■ For the rest, there was ample evidence supporting the judge's finding that Byrd had advertised himself to Smith as one who would help her avoid foreclosure, and that she dealt with him on that understanding. As the judge found:

> Byrd [had] mailed ... Smith a notice advising her of the services offered by Creative Investment Company[, a company he solely owned and managed]. The kind of notice Byrd or CIC typically sends states: "We are foreclosure specialists ... [who] offer a number of creative programs that will allow you to keep your home." It assures recipients: "We have helped many homeowners that have experienced what you are going through." At trial, Jerry Thomas, a former CIC salesman, testified that Byrd was in the business of helping people keep their homes.

Although Byrd contends there was no proof that Smith received this mailed solicitation or relied on it (rather than on an accompanying one announcing him as a potential buyer of homes), trial evidence

---

4. Smith had also sued Byrd for common law fraud, negligence, and intentional infliction of emotional distress. The judge did not address the issue of fraud because, in her view, that cause of action was duplicative of liability under the CPPA, and she found Smith's "ar-

guments on negligence [un]persuasive." Implicitly the judge also rejected the claim for infliction of emotional distress. Plaintiff-appellee has not challenged these rulings by cross-appeal.

refutes that argument. As the judge found, Byrd initially assisted Smith in filing a *pro se* bankruptcy petition—a measure that, according to testimony, generally enables a debtor to work out a payment plan with a mortgage company—but later allowed the petition to be dismissed with prejudice for failure to file court-ordered schedules. (As the judge pointed out, dismissal of the bankruptcy petition made Smith vulnerable to foreclosure, and it was following this that Byrd prepared the documents, which he caused Smith to sign, transferring ownership of the house to his partnership.) After the bankruptcy filing, Byrd met with Smith repeatedly either himself or though an intermediary, and the "solid evidence" (the judge's phrase) that Smith had no intention of selling her home strongly supports the judge's inference that the "elderly[,] bedridden" Smith understood these meetings to involve a continued effort to avoid foreclosure, not the sale of her home.[5]

It remains for us (on the issue of liability) to reject Byrd's argument that, assuming he offered his services to Smith as one who would help her avoid foreclosure, he still committed no unfair trade practices. The judge found multiple violations of the CPPA, but it is enough for us to conclude that the record overwhelmingly demonstrates that Byrd falsely "advertise[d]" foreclosure-avoidance services "without the intent to sell them or . . . to sell them as advertised or offered." Section § 28–3904(h). As the judge found:

The advertised purpose of CIC, Byrd's business, was to help people keep their homes. . . . Byrd had no intention of helping Smith keep her home. Despite

the advertising put out by CIC and the mythology articulated by the former CIC salesman Thomas, the real purpose of Byrd's business with . . . Smith was to buy her home for an insignificant sum of money. When asked to identify each visit he made to Smith's home, Byrd stated that he visited Smith's home several times for the "purpose of negotiating the purchase from plaintiff [Smith]." Thus, Byrd himself virtually admit[ted] that his intent . . . was to purchase her home, not to help her save her home as he advertised or offered when he solicited her business.

Finally, we reject Byrd's challenge to the appropriateness of the treble damages award. " '[O]nce it is established that a consumer [has] suffered any damage, the CPPA authorizes [the] court[] to treble damages without further findings.' " *District Cablevision Ltd. P'ship v. Bassin,* 828 A.2d 714, 729 (D.C.2003) (quoting *Williams v. First Gov't Mortgage & Investors Corp.,* 343 U.S.App. D.C. 222, 229, 225 F.3d 738, 745 (2000)). The judge trebled the damages "because Smith lost $148,175.41 equity in her home when . . . Byrd obtained it." (The actual award of $315,026.23 represented a multiplier of three minus a credit of $129,500 from other settling defendants.) Byrd's false advertising of his services alone sufficed to justify the trebling. As the judge concluded, it enabled him to gain Smith's trust by a promise to save her home, after which he "orchestrat[ed]" the scheme to gain title to the home "for a fraction of its value." Both the treble damages, which under the CPPA "serve a remedial rather than a

---

5. As the judge found: "[Smith] told [her niece] Tyreisha Coleman the night Byrd first visited that she would not sell her home; many months later upon being told the home was sold, Smith became tearful and repeated that she 'would not sell her house to anyone.'

The terms and circumstances of the transaction [including the fact 'that Byrd never actually paid Smith anything'] also evidence that Smith was unaware she was selling her house[, but instead understood the transaction to be 'a refinancing rather than a sale']."

punitive purpose," *id.* at 728, and the separate punitive damages award—which the judge assessed after finding Byrd's actions to have been "particularly malicious because ... calculated to take advantage of a frail, elderly and vulnerable widow"—are entirely justified on this record.

*Affirmed.*