MODERN MANAGEMENT COMPA-
NY, Vincent L. Abell, and Cal-
vin Baltimore, Appellants,

v.

Maria–Theresa WILSON, Appellee.

Nos. 08–CV–18, 08–CV–85, 08–CV–187.

District of Columbia Court of Appeals.

Argued Sept. 24, 2009.
Decided June 3, 2010.

David H. Cox, with whom Lydia Auzoux, Washington, DC, was on the brief, for appellants.

Jessica L. Ellsworth, Washington, DC, with whom N. Thomas Connally III, McLean, VA, and Jeffrey D. Pariser were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

This case arises from an unconscionable 2003 real estate transaction whereby appellee, Maria–Theresa Wilson, suffering from health problems and facing foreclosure, transferred title to her home (that she owned for twenty-two years) to appellant Vincent Abell, the sole owner of appellant Modern Management Company ("Modern Management"). Appellant Calvin Baltimore, who represented himself as a money lender, knocked on Wilson's door

three days before her house was scheduled to go into foreclosure and convinced her to participate in appellants' scheme. Wilson transferred title to her home to Abell, but under the terms of the transaction, she remained liable for the mortgage payments and became a tenant in her own home. In fact, her monthly "rent" exceeded the amount of her previous mortgage payments. Wilson soon defaulted on the "lease," and Abell brought eviction proceedings against her to remove her from her own home.

Following a jury trial, appellants Vincent Abell, Modern Management Company, and Calvin Baltimore were all found liable for common law fraud and for violating the D.C. Consumer Protection Procedures Act ("CPPA") for their various misrepresentations and omissions of material facts and for including "unconscionable terms" in the transaction.[1] The jury awarded Wilson $60,000 in compensatory damages for the common law fraud and CPPA violations, which the trial judge trebled pursuant to the CPPA, D.C.Code § 28–3905(k)(1), and punitive damages in the amount of $2 million against Abell, $1.1 million against Modern Management, and $200,000 against Baltimore, respectively. We affirm.

Appellants raise a sharply contested issue of considerable importance by challenging the award of punitive damages against them as constitutionally excessive. In addition, they contend that 1) the trial court erred in permitting Wilson to pursue her RICO claims and admitting evidence that appellants had completed one hundred similar transactions, which caused the jury to inflate the punitive damages awards; 2) the compensatory damage award must be reduced by the amount of the settlement agreement Wilson reached before trial with appellants' former co-defendant;[2] 3) the trial court erred in submitting to the jury the issue of whether Wilson was a "consumer" as defined in the CPPA; and 4) the jury verdict finding appellants liable for common law fraud and for violations of the CPPA was against the weight of the evidence.

First, we focus our analysis on the issue of whether the punitive damages awarded by the jury are unconstitutionally excessive, and then we address each of the remaining issues in turn. We uphold the punitive damages awards entered against the appellants. For the reasons explained more fully below, we affirm on all issues, but remand and direct the trial court to apply the $40,000 setoff to the treble award.

## I.

### Background

Appellant Maria–Theresa Wilson purchased her house at 1300 Taylor Street

---

1. Wilson filed suit alleging common law and statutory fraud pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. §§ 1961–1964.; the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C.Code §§ 28–3901 to–3905 (2001 & 2009 Supp.); the Truth In Lending Practices Act ("TILPA"), 15 U.S.C.A. §§ 1635–1640; the District of Columbia Loan Sharking Act, D.C.Code § 26–901 (2009 Supp.); the District of Columbia Consumer Credit Services Amendment Act, D.C.Code §§ 28–4601 to –4603 (2001); the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C.A. §§ 1602, 1639; and the District of Columbia Usury Statute, D.C.Code § 28–3301 (2009 Supp.).

2. Appellants also contend that the trial court erred in failing to enter judgment post-trial on their counterclaim for unpaid rent despite the fact that they did not present the counterclaim to the jury. The record supports the trial court's finding that appellants' counterclaim had no merit as appellants conceded at trial that the counterclaim was "only relevant in the event of rescission," and Wilson elected damages over rescission.

Northwest in 1981. She lived there continuously until 1997, when she suffered a severe head injury at work that prevented her from being able to work consistently. After her injury in 1997, Wilson suffered two additional head injuries causing her to develop epilepsy and suffer seizures. Wilson began spending approximately fifty percent of her time at her elderly mother's house (a few blocks away from the house on Taylor Street) due to Wilson's health problems and in order to care for her mother after the death of her father. In June 2001, Wilson registered her Taylor Street home as rental housing with the District of Columbia Department of Consumer Affairs and leased part of the property to tenants for additional income, but she always kept a set of keys to the house and maintained a room there for space to work on her art.[3] She also continued to receive mail at the house and listed it as her residence on her District of Columbia identification card, which was issued in 2002.

In September 2003, Wilson received a foreclosure notice indicating that she had to pay at least $42,525 by October 2, 2003, to avoid foreclosure. On September 27, 2003, five days before the scheduled foreclosure date, appellant Calvin Baltimore left a business card at Wilson's home, advertising himself on the front of the card as:

"Baltimore Company, Money Lenders, Buy and Sell Homes, 24 Hours, Seven Days a Week, Foreclosures Specialists, Calvin Baltimore, President, CEO, CPA."

The back of the card read:

"We will help you to save the equity in your home. We will buy your home, pay off your mortgage, pay you your equity. We will also pay your mortgage current, stop foreclosure, lease the home back to you, give you some money and give you a chance to buy back when you continue to live in your home. Please call immediately for help."

In fact, Baltimore was not a certified public accountant (CPA) and he claimed at trial that the money lender language was printed on his business card in error by the printing company where he ordered his cards. Baltimore's company prepared pre-foreclosure contracts for Vincent Abell, the owner/manager of Modern Management, but Baltimore did not actually lend money. Baltimore described himself as a "consultant" for Abell, and said that he was responsible for Abell's pre-foreclosure transactions and for approaching homeowners to prepare and sign the foreclosure contracts on Abell's behalf. After seeing his card, Wilson called Baltimore immediately to set up an appointment before the upcoming foreclosure.

■ On September 30, 2003, Baltimore met with Wilson and her friend at Wilson's home and offered to buy the house for cash. Wilson declined the offer, stating: "I'm not interested in selling my property[,] I'd like to be able to keep it." As an alternative, Baltimore offered Wilson a lease-back option, whereby Wilson would pay $2,100 per month to continue living in her home. Wilson declined this offer as well because she could only afford a maximum monthly payment of $1,800. After getting approval from Abell over the phone, Baltimore offered Wilson the lease-back option for $1,800 a month. Wilson signed an "Agreement to Sell Real Estate," which was prepared and signed by Baltimore, who listed himself as "Agent

---

3. Wilson charged her tenant $625 monthly rent, while her mortgage payments were approximately $1,500.

for Vincent Abell" under his signature.[4] Baltimore left Wilson with an "Authorization to Release Information" form that listed Wilson as the "borrower" under the signature line.[5] The next day, Baltimore returned and drove Wilson and her friend to the transaction "closing" with Abell at the law offices of Houlon Berman.

At the "closing," Wilson signed various documents, including: a "Deed," a "Real Property and Transfer Form," an "Owner/Seller Affidavit," and a "Seller Affidavit of Sales Subject to Mortgage." Wilson asked why the titles of certain documents indicated a sale of her home when she intended only to obtain a loan to stop the foreclosure. In response, both Abell and the attorney from Houlon Berman told Wilson that the sale was only a "legal fiction" which was necessary to speed up the process because the foreclosure was scheduled to go forward in two days. A sales price was never negotiated during the transaction. While the Deed represented that Wilson was to receive "consideration of $199,273.10" for the sale, Wilson only received a payment $5,000 via check.[6] The end result of the transaction was that Wilson remained liable for the mortgage (which Abell did not assume) but then she also had to pay rent to remain in the home.

Wilson entered into a one year "Lease Agreement" whereby Abell leased the property back to her. The Lease Agreement included an "Option to Purchase" provision which she could invoke at the end of the year. Pursuant to Section 5 of the lease, Wilson was to pay $2,100 [7] for rent ($600 more than her mortgage payments prior to the transaction). However, Wilson contends that she intended the payments to go towards the loan that she obtained to stop the foreclosure, and not to appellants as rent. Ultimately, when Wilson failed to make any of the rent payments during the thirteen months following the sales transaction, Abell sued her for possession of the property and successfully evicted her from her house. Following her eviction, Wilson initiated this action in February 2005 against appellants and their former co-defendant Houlon Berman.

Appellants moved for partial summary judgment on Wilson's CPPA, fraud, and RICO claims. Initially, the trial judge granted partial summary judgment, dismissing the RICO claims. But Wilson filed a motion for reconsideration, contending that the trial judge improperly dismissed the RICO claims because appellants failed to make any legal or factual

---

4. Contrary to appellants' contention that there was insufficient evidence to find Abell vicariously liable for Baltimore's actions, the record clearly supports such a finding. Abell testified that he hired Baltimore to work as an "independent contractor" to approach homeowners facing foreclosure and inquire whether they were interested in selling their property. Moreover, Abell ratified Baltimore's actions at the closing. *See Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 671–72 (D.C.1983).

5. According to Baltimore, his failure to change the "borrower" term to "seller" was an oversight because his practice was to use the same form in all of his business transactions to obtain mortgage information.

6. After the transaction, Abell paid the outstanding liens on the property and the $45,000 required to reinstate the mortgage and stop the foreclosure. Abell claims that these payments constitute consideration in addition to the $5,000 cash paid to the title company that issued Wilson the check because he took the property subject to the liens.

7. Under the Lease Agreement, Wilson owed $1,800 per month in rent and had to pay the remaining $300 from each month only if she exercised the buy-back option at the end of the year.

arguments supporting their dismissal.[8] Wilson's counsel argued that Abell's "scheme" for RICO purposes was to "approach homeowners that are in foreclosure, tell them that they're going to lend them money to save their house, and by trick, take title from the homeowners, make them a tenant in their own house, and then come to landlord/tenant court and try and kick them out of their own house." The trial judge granted the motion for reconsideration and at this stage of the proceedings, she permitted Wilson to pursue her RICO claims.

In addition to the motion for partial summary judgment, appellants filed a series of motions *in limine* to exclude testimony about Wilson's physical condition, the fair market value of the property, and evidence and testimony regarding Abell and Modern Management's "other transactions," where they allegedly employed the same scheme against other vulnerable homeowners.[9] The trial court denied all of appellants motions *in limine*, permitting the evidence to be presented to the jury.[10]

8. Count II of Wilson's complaint alleged that appellants violated 18 U.S.C. § 1962(c), which provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." Count III of Wilson's complaint alleged that appellants conspired to violate § 1962(c). *See* 18 U.S.C. § 1962(d).

In appellants' motion for summary judgment, the only reference to Wilson's RICO claims was in the concluding paragraph, where appellants requested partial summary judgment on "Counts I through IV," Counts II and III being Wilson's RICO claims. Because appellants, as the moving party, failed to meet their burden of establishing "an absence of evidence supporting [Wilson's] claim," we cannot say that the trial court abused its discretion in granting the motion for reconsideration and permitting Wilson to pursue her RICO claims. *See Tolu v. Ayodeji*, 945 A.2d 596, 600 (D.C.2008) (citations omitted).

9. Wilson sought to introduce evidence of the fair market value of the home to quantify her harm. Appellants argued to exclude the evidence because Wilson would have received less than fair market value for her house because she faced "inevitable foreclosure." Appellants also sought to exclude testimony regarding Wilson's medical history because such evidence was "irrelevant." We conclude that the trial court did not abuse its discretion in denying the motions *in limine*. *See Coulter v. Gerald Family Care, P.C.*, 964

A.2d 170, 185 n. 11 (D.C.2009) (citing *Ivey v. District of Columbia*, 949 A.2d 607, 611 (D.C. 2008)).

The trial court denied the motion *in limine* to exclude evidence of the fair market value of the house "for reasons set forth in the opposition." Wilson listed several arguments in opposition to the motion *in limine*, the principal one being that appellants' contention was based on facts in the record that would be disputed at trial. Further, Wilson's medical condition is directly relevant to her CPPA claim where she alleges that appellants took advantage of her inability to protect her interests "by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement...." D.C.Code § 28–3904(r)(5).

10. Appellants also filed a motion *in limine* arguing that Wilson was required to elect her remedy of either rescission or damages before trial because she requested various "mutually exclusive" equitable and legal relief. This argument has no merit and the trial court properly denied the motion. While it is true that when the remedies a plaintiff seeks are "duplicative," the plaintiff cannot win relief on both claims, we have also recognized that a plaintiff is not required to "elect between [ ] alternative claims before the case is submitted to the jury." *See Giordano v. Interdonato*, 586 A.2d 714, 717–18 (D.C.1991); *compare id.* (concluding that plaintiff should not have been forced before trial to elect between putting claims for breach of fiduciary duty or specific performance of agreement to the jury), *with Dean v. Garland*, 779 A.2d 911, 916 (D.C.2001) (concluding that the trial

Before the case was submitted to the jury, appellants moved for judgment as a matter of law a second time, and the trial judge granted the motion with respect to the RICO claims because she found that the evidence presented did not amount to a "pattern or practice," within the meaning of the RICO statute. 18 U.S.C. § 1961. The jury found appellants liable for common law fraud and for violating the CPPA by making misrepresentations and omissions of material facts and including "unconscionable terms" in the transaction. After trial, appellants filed a motion for judgment notwithstanding the verdict ("JNOV") and a motion for a new trial on damages, both of which were denied. This appeal followed.

## II.

### Punitive Damages Analysis

#### A.

■ In reviewing appellants' constitutional challenge to the punitive damage awards in this case, we think it is useful to revisit and distill the legal principles and guidance gleaned from the relevant Supreme Court cases. The Due Process Clauses of the Fifth [11] and Fourteenth Amendments prohibit a State from imposing a "grossly excessive" civil punishment upon a tortfeasor.[12] The Supreme Court has had several opportunities to consider due process challenges to punitive damage awards. From these cases, we glean several illuminating principles and concerns which have guided the Supreme Court's review of punitive damage awards. These principles include the concern that: 1) courts conduct a "meaningful and adequate review" of a jury's punitive damage award both at the trial and appellate level to ensure that the award is the product of a process that is entitled to a strong presumption of validity; 2) the award punishes truly reprehensible conduct; 3) the punitive damage award has some relation to the harm suffered by the plaintiff and evidences "reasonableness and proportionality," although there is no "bright-line" ratio, to ensure that the award is not grossly out of proportion to the severity of the offense; and 4) the award advances a State policy concern such as protection of the public by deterring the defendant or others from doing such wrong in the future.

court did not err in dismissing the rescission count before trial because the plaintiffs sought both rescission of the contract and damages for breach of the contract and the plaintiffs were no longer entitled to rescission). Here, Wilson sought alternative recovery under several different statutes for the appellants' conduct, specifically asserting that the transaction was an unconscionable loan or, in the alternative, if the jury decided that the transaction was not a loan, a fraudulent sale. Therefore, the trial court did not err in refusing to require Wilson to elect her remedies prior to trial.

11. We note that while the cases we use in our analysis discuss whether punitive awards are excessive under the Due Process Clause of the Fourteenth Amendment, our holding is based on the Due Process Clause of the Fifth Amendment, which applies to the District of Columbia. *See District of Columbia v. Carter,* 409 U.S. 418, 424, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) ("[S]ince the District of Columbia is not a 'State' within the meaning of the Fourteenth Amendment, neither the District nor its officers are subject to its restrictions.") (citations omitted); *see also McNeil v. United States,* 933 A.2d 354, 362 n. 11 (D.C.2007) (noting that, in the District of Columbia, the Due Process Clauses of the Fifth and Fourteenth Amendments provide "equivalent protection").

12. *Cooper Indus., Inc. v. Leatherman Tool Group,* 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001); *BMW, of N. Am., Inc. v. Gore,* 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 453–55, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality opinion).

In its first case reviewing whether punitive damage awards may violate the Due Process Clause of the Fourteenth Amendment, *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Supreme Court noted its concern that such awards may "run wild." There, Haslip brought a claim for fraud against Pacific Mutual and its employee after the insurance agent misappropriated checks for a customer's premium payments, which resulted in a lapse of her health insurance coverage. Notices of the lapse in coverage were not forwarded to Haslip, who was forced to pay her hospital bill on discharge because the hospital could not confirm her health coverage.

The jury returned a general verdict for $1,040,000.[13] On appeal, the Supreme Court of Alabama affirmed the punitive damage award. Pacific Mutual Life then petitioned for *certiorari* arguing that the punitive damage award was "the product of unbridled jury discretion and [ ] violative of its due process rights." *Id.* at 7, 111 S.Ct. 1032. Noting that the specific award in that case resulted in punitive damages more than four times the compensatory damages, the Court cautioned that "unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id.* at 18, 111 S.Ct. 1032. However, the Court refused to draw a mathematical line between awards that were "constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.*

In its analysis, the Supreme Court determined that Alabama law contained reasonable and adequate guidelines to appropriately delimit an award of punitive damages within the context of due process (through jury instructions and judicial review). In particular, the jury instructions sufficiently conveyed the purpose of punitive damages—" 'not to compensate the plaintiff for any injury' but 'to punish the defendant' and 'for the added purpose of protecting the public by [deterring] the defendant and others from doing such wrong in the future.' " *Id.* at 19, 111 S.Ct. 1032 (quoting the jury instructions) (alteration added in *Haslip*). The Court also held that the jury instructions limited the jury's discretion—"[i]t was confined to deterrence and retribution, the [S]tate policy concerns sought to be advanced." *Id.* In addition, the Court noted that "the Supreme Court of Alabama had established post-trial procedures for scrutinizing punitive awards." *Id.* at 20, 111 S.Ct. 1032. These procedures together allowed the "meaningful and adequate review" by both the trial court and the Supreme Court of Alabama. *Id.* "The Alabama Supreme Court's postverdict review ensures that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages." *Id.* at 22, 111 S.Ct. 1032. Accordingly, the Supreme Court upheld the punitive damage award and concluded that it was not unconstitutionally excessive. *Id.* at 24, 111 S.Ct. 1032. The Court's concern in *Haslip* that courts conduct meaningful and adequate review of punitive damages awards is consistently echoed in the subsequent Court cases. This concern is one which we deem critical in our analysis here.

---

**13.** The Supreme Court noted that "it is probable that the general verdict for respondent Haslip contained a punitive damage component of not less than $840,000" because the appellant's counsel requested $200,000 in compensatory damages and $3,000,000 in punitive damages. *Haslip, supra,* 499 U.S. at 6 n. 2, 111 S.Ct. 1032.

Two years later, in *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality opinion), a constitutional challenge to a punitive damages award came before the Supreme Court again, this time in the context of a common law slander-of-title-action. There, TXO argued that the punitive damages award was unconstitutional, both because the amount was excessive and because it was the product of an unfair procedure. TXO argued that the award was the result of a "fundamentally unfair procedure because the jury was not adequately instructed, because its award was not adequately reviewed by the trial or the appellate court, and because TXO had no advance notice that the jury might be allowed to return such a large award or to rely on potential harm as a basis for its calculation." *Id.* at 462–63, 113 S.Ct. 2711. In upholding the punitive award of $10 million and compensatory award of only $19,000—a 526:1 ratio—the Court followed the rationale of *Haslip,* and examined both whether fair and adequate procedures were followed and whether there was a reasonable relationship between the award and the harm that occurred (or was likely to occur) from the defendant's conduct. *Id.* at 458, 113 S.Ct. 2711.

In addressing the challenge to the procedure, the Court reasoned that "[a]ssuming that fair procedures were followed, a judgment that is a product of that process is entitled to a strong *presumption* of validity." *Id.* at 457, 113 S.Ct. 2711 (emphasis added). Viewing the fact that the trial judge did not articulate his reasons for upholding the award, the Court concluded that "we certainly are not prepared to characterize the trial judge's failure to articulate the basis for his denial of the motions for judgment notwithstanding the verdict and for remittitur as a constitutional violation." *Id.* at 465, 113 S.Ct. 2711. The Court concluded that the judge gave counsel an adequate hearing on the post-verdict motions and concluded that fair procedures were followed.

The Court in *TXO* again sought to insure the reasonableness of the amount of punitive awards, but it reiterated that "[w]e need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* at 458, 113 S.Ct. 2711. Instead, the Court maintained that a "general concer[n] of *reasonableness* ... properly enter[s] into the constitutional calculus." *Id.* (citing *Haslip, supra,* 499 U.S. at 18, 111 S.Ct. 1032) (emphasis added). The Court recognized that the *Haslip* punitive award was four times the amount of compensatory damages and " 'may be close to the line' of constitutional permissibility," *Id.* at 459, 113 S.Ct. 2711 (citing *Haslip, supra,* 499 U.S. at 23, 111 S.Ct. 1032), but also noted that it had "eschewed an approach that concentrates entirely on the relationship between actual and punitive damages." *Id.* at 460, 113 S.Ct. 2711. Specifically, the Court "did not consider the dramatic disparity between the actual damages and the punitive award controlling in a case of this character." *Id.* at 462, 113 S.Ct. 2711. The Court determined that, "in light of the amount of money potentially at stake, the bad faith of petitioner, the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and petitioner's wealth, [it was] not persuaded that the award was so *'grossly excessive'* as to be beyond the power of the State to allow." *Id.* (emphasis added). The Court upheld the punitive award relying in large part on principles set forth in *Haslip,* notwithstanding the fact that the ratio of punitive to compensatory damages was 526:1 in *TXO* compared to 4:1 in *Haslip.*

In contrast to *Haslip* and *TXO*, in *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), the Supreme Court overturned the punitive award based on the inadequacy of the State procedures for reviewing such awards. The jury imposed punitive damages of more than five times the amount of the compensatory damages. Both the intermediate appellate and Oregon Supreme Courts upheld the jury award without review. However, the Supreme Court held that "Oregon's denial of judicial review of the size of punitive damages awards violates the Due Process Clause of the Fourteenth Amendment." *Id.* at 432, 114 S.Ct. 2331. The Supreme Court reasoned that:

> [P]unitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences. Judicial review of the amount awarded was one of the few procedural safeguards which the common law provided against that danger. Oregon ha[d] removed that safeguard without providing any substitute procedure and without any indication that the danger if arbitrary awards had in any way subsided over time. *Id.*

The Supreme Court declined to uphold the punitive damage award and reversed and remanded to the Oregon Supreme Court for further proceedings. *Id.* at 435, 114 S.Ct. 2331.

When read together, these early punitive damages cases, *Haslip*, *TXO*, and *Honda*, show the Court's concern for preventing "wild" jury awards by upholding awards that have been reviewed through a "fair and adequate" process, because such review protects defendants' rights by ensuring that there is a check on jury discretion. At the same time, the Court's jurisprudence evinces a reluctance to draw a "bright-line" ratio for reviewing awards under the process but instead focuses the inquiry on whether the award is reasonable when compared to both the actual or potential harm suffered and the State's interest in protecting the public by deterring future unlawful conduct.

Continuing its examination of punitive damage excessiveness challenges in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court reiterated and further developed the principles from its earlier cases and more clearly articulated the principle that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." In *Gore*, the Court reasoned that "BMW did not receive adequate notice of the magnitude of the sanction that Alabama might impose" for fraud in adhering to a nationwide policy of non-disclosure in selling repainted automobiles as new. *Id.* at 574, 116 S.Ct. 1589. The trial court denied the defendant's post-trial motion to reduce the award as excessive. However, the Alabama Supreme Court concluded that the jury improperly computed the amount of punitive damages, and it recalculated the punitive damages to a "constitutionally reasonable" punitive damages award of $2 million. *Id.* at 567, 116 S.Ct. 1589.

The Supreme Court in *Gore* articulated three guideposts for reviewing courts to use in evaluating whether punitive damages awards are unconstitutionally excessive. The *Gore* guideposts are based on concerns expressed by the Court in its

earlier punitive awards cases. These guideposts are: 1) the degree of reprehensibility of the conduct; 2) the ratio of the punitive damages to the actual harm inflicted on the plaintiff; and 3) a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct.[14] *Id.* at 574–75, 116 S.Ct. 1589. In applying these guideposts, the Court determined that BMW's conduct was not sufficiently reprehensible because the harm was not performance or safety related, but rather "purely economic," and the plaintiff was not financially vulnerable. *Id.* at 576, 116 S.Ct. 1589. Therefore, the Court reasoned that the conduct did not show an "indifference to or reckless disregard for the health or safety of others." *Id.* The Court continued to reject the notion of drawing a constitutional line "marked by a simple mathematical formula," but noted that the punitive award was "breathtaking" at 500 times the amount of actual harm and bore no reasonable relationship to the compensatory damages awarded. *Id.* at 582–83, 116 S.Ct. 1589. Finally, the Court concluded that the $2 million was "substantially greater" than the statutory fines available in Alabama and elsewhere for similar malfeasance. *Id.* at 583–84, 116 S.Ct. 1589. Holding that the award was unconstitutionally excessive, the Court reversed the judgment and remanded the case for further proceedings. *Id.* at 586, 116 S.Ct. 1589.[15]

The *Gore* guideposts were applied and expounded upon by the Court in *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). The Court also incorporated the principles of its earlier punitive award cases, discussed *supra.* There, the Campbells, who were insured by State Farm, filed a complaint against State Farm alleging bad faith, fraud, and intentional infliction of emotional distress, because State Farm insisted on taking a wrongful death case against the Campbells to trial instead of settling with the plaintiffs within the policy limit (all while assuring the Campbells that they did not need to obtain separate counsel). When the Campbells were found liable and judgment was entered against them in an amount more than $180,000 over the settlement offer, State Farm refused to cover the excess liability. *Id.* at 413–14, 123 S.Ct. 1513. In the fraud action brought by the Campbells against State Farm, the jury awarded $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million, respectively. *Id.* at 415, 123 S.Ct. 1513. The Utah Supreme Court reinstated the $145 million punitive damages award after applying the *Gore* guideposts. *Id.* Reversing the Utah Supreme Court, the United States Supreme Court reiterated its con-

**14.** The punitive award Supreme Court cases have all been divided opinions with the dissenting and concurring justices expressing skepticism about whether constitutional review of the amount of punitive awards is warranted. Notably, Justice Scalia, who concurred in judgment in *Haslip* and *TXO,* and dissented in *Gore,* expressed his view that the " '[*Gore* ] guideposts' mark a road to nowhere; they provide no real guidance at all." *Gore, supra,* 517 U.S. at 605, 116 S.Ct. 1589 (Scalia, J., dissenting).

**15.** The Court reiterated the guideposts in *Cooper Indus., Inc., supra* note 12, 532 U.S. at 436, 121 S.Ct. 1678, where the Court held that appellate courts should apply a *de novo* standard of review when assessing the constitutionality of punitive damage awards. Because the Ninth Circuit applied the abuse of discretion standard, the Court did not address the $50,000 in compensatory and $4.5 million in punitive damages awarded under the Lanham Act; instead it remanded for the Court of Appeals to apply the *de novo* standard of review.

cern about the reasonableness of punitive awards by stressing that "[t]he principles set forth in *Gore* must be implemented with care, to ensure both reasonableness and proportionality." *Id.* at 428, 123 S.Ct. 1513.

In applying the first *Gore* guidepost, the Court provided additional guidance on how a reviewing court should evaluate the level of reprehensibility of the defendant's conduct. Specifically, in evaluating whether State Farm's conduct toward the Campbells was sufficiently reprehensible, the Court factored whether: 1) "the harm caused was physical as opposed to economic"; 2) "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; 3) "the target of the conduct had financial vulnerability"; 4) "the conduct involved repeated actions or was an isolated incident"; and 5) "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 419, 123 S.Ct. 1513. The Court concluded that State Farm's conduct was not so reprehensible to warrant the punitive damages awarded by the jury because the harm was economic and "not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed so the [appellees] suffered only minor economic injuries for the 18–month period in which State Farm refused to resolve the claim against them." *Id.* at 426, 123 S.Ct. 1513.

In applying the second guidepost, the Court compared the punitive award to actual harm, and again declined to impose a "bright-line" ratio. However, the Court recognized that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages *to a significant degree,* will satisfy due process." *Id.* at 425, 123 S.Ct. 1513 (emphasis added). Referencing the 4:1 ratio from *Has-*

*lip* and cited in *Gore,* the Court reiterated that such awards "might be close to the line of constitutional impropriety," but also noted that "[w]hile these ratios are not binding, they are instructive[,] [t]hey demonstrate ... [that] [s]ingle-digit multipliers are *more likely* to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in the range of 500 to 1, or, in this case, of 145 to 1." *Id.* (citing *Gore, supra,* 517 U.S. at 582, 116 S.Ct. 1589) (emphasis added). Further, the *State Farm* Court went on to note that "because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Id.* However, the Court found the Campbells' compensatory award "substantial" as appellees "were awarded $1 million for a year and a half of emotional distress." *Id.* at 426, 123 S.Ct. 1513. Ultimately, the Court held that the award was "neither reasonable nor proportionate to the wrong committed, and ... an irrational and arbitrary deprivation" of State Farm's property, so the Court reversed the judgment and remanded to the Utah Supreme Court for further proceedings to determine the appropriate amount of punitive damages. *Id.* at 429, 123 S.Ct. 1513.

The Court's decisions in *Gore* and *State Farm,* reflect its attempt to articulate an additional check against seemingly high awards and its continued concern that some awards, though properly reviewed through a "fair and adequate" process, may still be unreasonable when compared to the level of egregiousness of the conduct at issue and the actual or potential harm suffered. Notwithstanding this concern, the Court still refused to articulate a constitutional limit for punitive awards and

has steadfastly exercised restraint in overturning punitive awards.[16]

More recently,[17] in *Philip Morris USA v. Williams*, 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007), the Court, once again reiterating its concern for a fair process which gives rise to a presumption of legitimacy, concluded that "the Due Process Clause requires States to provide assurance that juries are not ... seeking

16. The Court's restraint in this area is likely due to the fact that the Supreme Court's punitive damages jurisprudence has remained divided on the issue of whether the Constitution constrains the size of punitive damages and whether the Court is warranted in overturning awards that were properly scrutinized by state courts. Justice Scalia has consistently held the view that "[s]ince it has been the traditional practice of American courts to leave punitive damages ... to the discretion of the jury; and since ... a process that accords with such a tradition and does not violate the Bill of Rights necessarily constitutes 'due' process," inquiry into "fairness" and "reasonableness" of awards is unwarranted. *Haslip, supra,* 499 U.S. at 24–25, 111 S.Ct. 1032 (Scalia, J., concurring in judgment). In *Gore,* Justice Scalia reiterated his consistent view that "a state trial procedure that commits the decision whether to impose punitive damages, and the amount, to the discretion of the jury, subject to some judicial review of 'reasonableness,' furnishes a defendant with all the process that is 'due.' " *Gore, supra,* 517 U.S. at 598, 116 S.Ct. 1589 (citing *TXO, supra,* 509 U.S. 443, 470, 113 S.Ct. 2711, 125 L.Ed.2d 366 (Scalia, J., concurring in judgment); *Haslip, supra,* 499 U.S. at 25–28, 111 S.Ct. 1032 (Scalia, J., concurring in judgment)).

Justice Thomas, has consistently held the view that "the Constitution does not constrain the size of punitive damages awards." *Philip Morris USA v. Williams,* 549 U.S. 346, 361, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) (Thomas, J., dissenting) (quoting *State Farm, supra,* 538 U.S. at 429–30, 123 S.Ct. 1513 (Thomas, J., dissenting)) (quoting *Cooper Indus., supra* note 12, 532 U.S. at 443, 121 S.Ct. 1678 (Thomas, J., concurring)). Notably, Justice Thomas joined Justice Scalia's concurrence in *TXO* and his dissent in *Gore* as well.

Justice Ginsburg has also expressed concern with the Court's "foray into punitive damages 'territory traditionally within the States' domain.' " *State Farm, supra,* 538 U.S. at 431, 123 S.Ct. 1513 (Ginsburg, J., dissenting) (quoting *Gore, supra,* 517 U.S. at 612, 116 S.Ct. 1589 (Ginsburg, J., dissenting)). In one of three dissenting opinions in *State Farm,* Justice Ginsburg noted the discrepancy between the award upheld in *Haslip* of more than 4 times the compensatory damages, and the award upheld in *TXO* of more than 526 times the actual damages. *Id.* at 430, 123 S.Ct. 1513. Justice Ginsburg holds the view that "the Court has no warrant to reform state law governing awards of punitive damages," *Id.* at 438–39, 123 S.Ct. 1513, and that " 'the laws of a particular State must suffice [to superintend punitive damages awards] until judges or legislators authorized to do so initiate system-wide change.' " *Id.* at 431, 123 S.Ct. 1513 (quoting *Haslip, supra,* 499 U.S. at 42, 111 S.Ct. 1032 (Kennedy, J., concurring in judgment)).

17. The Court most recently addressed the issue of punitive damage awards in federal maritime cases in *Exxon Shipping Co. v. Baker,* —— U.S. ——, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008). There, it held that "the federal statutory law does not bar a punitive damage award on top of damages for economic loss, but [ ] the award [ ] should be limited to an amount equal to compensatory damages." *Id.* at 2611. We do not focus on *Exxon* in our analysis because the Court's holding is limited to federal maritime cases. *See Duckworth v. United States ex rel. Locke,* 705 F.Supp.2d 30, 49 n. 13, 2010 WL 1499490 at *15 n. 13 (D.D.C.2010) ("However, *Exxon Shipping* involved punitive damages under federal maritime law, not civil enforcement penalties, and has no applicability here."); *see also Valore v. Islamic Rep. of Iran,* 700 F.Supp.2d. 52, 90 n. 17, 2010 WL 1244552 at *32 n. 17 (D.D.C. 2010) ("To the extent that some plaintiffs may share in a punitive damages award higher than their compensatory award, and thus a ratio of punitive to compensatory damages higher than 1:1, *Exxon* is distinguishable from this case. First, *Exxon* concerned punitive damages awarded under maritime law ... the Supreme Court explicitly limited its holding, noting that 'a 1:1 ratio ... is a fair upper limit *in such maritime cases.*' ") (citing *Exxon Shipping* at 2633) (emphasis added in *Valore* ).

... to punish for harm caused [to] strangers." *Id.* at 355, 127 S.Ct. 1057. The Court did not address the question of whether the punitive damage award of $79.5 million dollars was excessive when compared to the $821,000 in compensatory damages (nearly a 100:1 ratio) in a negligence and deceit lawsuit against a cigarette manufacturer for knowingly and falsely leading the decedent to believe that smoking was safe. The issue before the Court was "[w]hether the Constitution's Due Process Clause permits a jury to base that award in part upon its desire to punish the defendant for harming persons who are not before the court (e.g., victims whom the parties do not represent)." *Id.* at 349, 127 S.Ct. 1057. The Court held "that such an award would amount to a taking of 'property' from the defendant without due process." *Id.* In reaching its decision, the Court noted that the trial court rejected defense counsel's proposed jury instruction that specified that "the jury could not seek to punish Philip Morris for injury to other persons not before the court." *Id.* at 350, 127 S.Ct. 1057. Instead, the judge instructed the jury that "'[p]unitive damages are awarded against a defendant to punish misconduct and to deter misconduct,' and 'are not intended to compensate the plaintiff or anyone else for damages caused by the defendant's conduct.'" *Id.* at 351, 127 S.Ct. 1057. The Court concluded that, "[a]lthough the States have some flexibility to determine what *kind* of procedures they will implement, federal constitutional law obligates them to provide *some* form of protection in appropriate cases." *Id.* at 357, 127 S.Ct. 1057 (included in original). Holding that the State court applied the wrong constitutional standard to the appeal, the Court vacated the judgment and remanded the case to the Oregon Supreme Court to apply the proper standard. *Id.* at 357–58, 127 S.Ct. 1057.

In *Philip Morris,* as in previous cases, the Court continued to look first to the process under which the punitive damages were levied and reviewed. The Court held that the process was flawed because the trial judge refused to ensure that the defendant was not being punished for conduct against non-parties. We glean from the Court's jurisprudence that allowing juries to compensate a plaintiff for the defendant's conduct against non-parties invites "wild" or unreasonable awards and prevents the defendant from having notice of possible sanctions that could be levied against him in the suit.

The Court's divided opinions in each of the cases discussed *supra* have made it challenging for reviewing courts to distill the Court's views on the excessiveness of punitive awards. We think that the divided opinions caution us to exercise restraint in overturning jury awards that have been reviewed under fair and adequate State procedures and processes. Nevertheless, we look beyond the mathematical ratio to determine whether the punitive damages award is excessive. Rather than relying on mathematical ratios alone, we focus on the principles discussed in the Supreme Court cases, and specifically the concern that: 1) courts conduct a "meaningful and adequate review" of a jury's punitive damage award both at the trial and appellate level to ensure that the award is the product of a process that is entitled to a strong presumption of validity; 2) the award punishes truly reprehensible conduct; 3) the punitive damage award has some relation to the harm suffered by the plaintiff and evidences "reasonableness and proportionality," although there is no "bright-line" ratio, to ensure that the award is not grossly out of proportion to the severity of the offense; and 4) the award advances a State policy concern such as protection of

the public by deterring the defendant or others from doing such wrong in the future.

### B.

In the instant case, in examining whether the punitive damages awarded to Wilson are unconstitutionally excessive, we do so mindful of the principles we have distilled from the key Supreme Court cases and the application of those principles in numerous federal and state cases as well as in our own cases. Many of the more recent federal, state, and District of Columbia cases analyze punitive damages awards using the framework of the *Gore* guideposts, which reflect the Supreme Court's concerns, that the process afford a "meaningful and adequate" review of a jury punitive damage award and that the award evince "reasonableness and proportionality."

■ In this case, appellants rely on *Philip Morris, supra,* 549 U.S. at 346, 127 S.Ct. 1057, to support their contention that they were prejudiced by the admission of evidence regarding the one hundred similar pre-foreclosure transactions, which, they contend, resulted in the jury inflating the punitive damages awards to punish appellants for their conduct in unrelated transactions with non-parties.[18] Appellants' reliance on *Philip Morris* in this context is misplaced. Further, because the punitive damage awards comport with the principles we have gleaned from the Supreme Court jurisprudence, we conclude that the punitive damages in this case are not grossly excessive or violative of due process.

■ We disagree with appellants' argument that the punitive awards reflect the jury's attempt to punish them for their previous transactions with non-parties (which were the subject of the RICO claims that were dismissed and never submitted to the jury).[19] Contrary to appellants' assertions, *Philip Morris* is not applicable here. In reaching its conclusion in *Philip Morris,* the Court noted that in order to ensure that juries do not use the "rubric of reprehensibility" to punish a defendant for harm caused to others "where the risk of . . . misunderstanding is a significant one—because, for instance, of the sort of evidence that was introduced at trial or the kinds of argument the plaintiff made to the jury—a court, *upon request,* must protect against that risk." *Id.* at 357, 127 S.Ct. 1057 (emphasis added). Unlike the defendant in *Philip Morris,* appellants did not request that the trial court give a jury instruction to disregard the other pre-foreclosure-transactions evidence involving "strangers to the lawsuit," after the RICO claims were dismissed. Nor did appellants renew their objection or request a curative jury instruction to correct or avoid what they now argue may have been jury confusion regarding the evidence.[20]

---

**18.** The other transactions evidence was presented in support of Wilson's RICO claims. Once the judge dismissed those claims at trial, appellants did not request a jury instruction to disregard the previously admitted evidence about the other transactions. Thus, they failed to heed the rule that "where the judge has denied a defendant's prayer for relief during an earlier stage of a trial, and where the circumstances have changed as the case has progressed, a defendant must renew his request on the basis of the changed circumstances in order to preserve for appeal any contention based on the record as modified." *Comford v. United States,* 947 A.2d 1181, 1189 (D.C.2008) (quoting *Medrano–Quiroz v. United States,* 705 A.2d 642, 648 (D.C. 1997)).

**19.** See note 8, *supra.*

**20.** The punitive damages instruction read to the jury stated:

## C.

Appellants further challenge the validity of the punitive damages awards on the grounds that the awards are unconstitutionally excessive on their face. The trial judge, they argue, should have scrutinized and reduced the punitive damages. Appellants moved the trial court to set aside the awards, but the court denied appellants' motion, finding that "there was sufficient evidence presented regarding [appellants'] sale/lease-back/option to repurchase transaction to support the jury's punitive damages award."

We review a trial court's rulings on excessiveness of punitive damages *de novo*. *See State Farm, supra,* 538 U.S. at 418, 123 S.Ct. 1513 (citing *Cooper Indus., supra* note 12, 532 U.S. at 436, 121 S.Ct. 1678); *see also Daka, Inc. v. McCrae,* 839 A.2d 682, 697 (2003). Appellants have had the opportunity to raise the excessiveness challenge both at trial and on appeal. While appellants argue that the trial court should have scrutinized and reduced the punitive awards as "excessive on [their] face[s]," we view this as a close question and ultimately conclude in this case, that the punitive damages awards are constitu-

tionally acceptable. Appellants made the same arguments on punitive damages here that they did in their written motion to the trial court for JNOV. In addition to considering the motion, pleadings and oppositions, the trial judge held a hearing where appellants had the opportunity to advance the arguments that they make here on appeal. We have considered the concerns raised by the Supreme Court and cases in our jurisdiction and have carefully scrutinized the awards in light of these considerations, which are reflected in the *Gore* guideposts that we use to structure our analysis, and we conclude that the punitive damages awards in this case are constitutionally acceptable.

### Reprehensibility

The first *Gore* guidepost examines the reprehensibility of the defendant's actions. This guidepost reflects the Supreme Court's concern that the conduct the punitive damage award seeks to punish must be sufficiently reprehensible. Clearly, the conduct involved here—a scheme to dupe Wilson out of the title to the home she owned for twenty-two years and fought desperately to keep—was rep-

---

In addition to compensatory damages, the plaintiff also seeks an award of punitive damages against the defendant. Punitive damages are above and beyond the amount of compensatory [or nominal] damages you may award. Punitive damages are awarded to punish the defendant for his or her conduct and to serve as an example to prevent others from acting in a similar way. You may award punitive damages only if the plaintiff has proved with clear and convincing evidence:

(1) That the defendant acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff; and

(2) That the defendant's conduct itself was outrageous, grossly fraudulent, or reckless toward the safety of the plaintiff.

You may conclude that the defendant acted with a state of mind justifying punitive damages based on direct evidence or based on circumstantial evidence from the facts of the case. . . .

If you find that the plaintiff is entitled to an award of punitive damages then you must decide the amount of the award. To determine the amount of the award you may consider the net worth, relative wealth of the defendant at the time of the trial, the nature of the wrong committed, the state of mind of the defendant when the wrong was committed, the cost and duration of the litigation, and any attorney fees that the plaintiff has incurred in this case.

rehensible. "[T]he *most important* indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm, supra,* 538 U.S. at 419, 123 S.Ct. 1513 (emphasis added) (quoting *Gore, supra,* 517 U.S. at 575, 116 S.Ct. 1589). In our cases, we have expressed a concern that the plaintiff's conduct must meet a high standard of wrongfulness to justify a punitive award. In *Chatman v. Lawlor,* where this court discussed the sufficiency of evidence supporting an award of punitive damages, we recognized that "[p]unitive damages may be awarded 'only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages.'" 831 A.2d 395, 400 (D.C.2003) (citations omitted). The trial judge here was mindful of the high standard of wrongfulness necessary for imposing a punitive damages awards. Accordingly, the trial judge properly instructed the jury to award punitive damages *only* if it found by clear and convincing evidence that appellants "acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff" and that appellants' conduct was "outrageous" or "grossly fraudulent." The trial judge's instruction to the jury evinces the court's mindfulness of the longstanding principle that only truly reprehensible conduct should be punished by imposition of punitive damages.

■ The factors we consider when examining reprehensibility include whether: a) "the harm caused was physical as opposed to economic"; b) "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; c) "the target of the conduct had financial vulnerability"; d) "the conduct involved repeated actions or was an isolated incident"; and e) "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm, supra,* 538 U.S. at 419, 123 S.Ct. 1513.

■ Appellants mischaracterize this case as one where the harm was "purely economic" because they "simply bought a house and rented it back without paying enough for its value." This is an understatement of the harm appellants caused Wilson and further underscores the reckless indifference with which appellants acted. The harm to Wilson was not purely economic, though economic harm was clearly a key element of appellants' scheme. "[I]nfliction of economic injury, especially when done intentionally through affirmative acts of misconduct ... or when the target is financially vulnerable, can warrant a substantial penalty." *Gore, supra,* 517 U.S. at 576, 116 S.Ct. 1589 (citing *TXO, supra,* 509 U.S. at 453, 113 S.Ct. 2711). Appellants utilized "trickery or deceit" in their business dealings with Wilson by providing her with confusing paperwork that was purposely mislabeled. *See TXO, supra,* 509 U.S. at 462, 113 S.Ct. 2711 (upholding a $10 million punitive damages award in an action for slander of title because the appellant's scheme was "part of a larger pattern of fraud, trickery and deceit"). Appellant Baltimore sought out Wilson upon hearing of her imminent foreclosure and misrepresented himself as a "money lender" and, along with Abell, urged the transaction forward. In *Byrd v. Jackson,* we held that the punitive damages amount was justified when the trial court found that the appellant had "orchestrated [a] scheme to gain title to [a] home for a fraction of its value." 902 A.2d 778, 782–83 (D.C.2006) (internal quotation marks omitted). We affirmed the trial judge's award of treble and punitive damages where the trial judge found that the

defendant's actions were "particularly malicious because ... [they were] calculated to take advantage of a frail, elderly and vulnerable widow." *Id.* at 783. Similarly, here, Wilson was disabled, caring for her elderly mother, unable to work, and suffering under the weight of her dire financial situation. Wilson was tricked into selling the home that she owned for over twenty-two years in exchange for a mere $5,000, even though expert trial testimony established that the fair market value of the house was $300,000 at the time of the transaction in 2003. An impartial jury could reasonably find appellants' conduct sufficiently reprehensible to support the awards.

Further, although the evidence of the prior similar transactions in which Abell, Modern Management, and Baltimore were allegedly involved may not be used to punish Abell for harm caused to *other* homeowners, it may be considered when assessing the reprehensibility of Abell's actions. *See Philip Morris, supra,* 549 U.S. at 355, 127 S.Ct. 1057 ("Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and was so particularly reprehensible.... Yet ... a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties."); *see also Gore, supra,* 517 U.S. at 577, 116 S.Ct. 1589 ("Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance."). The purpose of the punitive damages provision is deterrence and retribution; therefore, the fact that appellants may have employed the same scheme before and the number of other transactions where appellants employed the same scheme is relevant to the amount that should be awarded to deter the defendant from future similar conduct. *See State Farm, supra,* 538 U.S. at 416, 123 S.Ct. 1513.

We are satisfied that appellants' actions are reprehensible to a degree that comports with the first *Gore* guidepost. We next address the second *Gore* guidepost.

**Punitive Damages Compared to the Harm**

Under the second *Gore* guidepost, we compare the punitive award to the actual harm inflicted on the plaintiff (compensatory damages). *See Gore, supra,* 517 U.S. at 580, 116 S.Ct. 1589. This guidepost reflects the principle discussed *supra* that a punitive damage award must be reasonable and proportional to the harm suffered. While the Supreme Court has recognized that "a comparison between the compensatory award and the punitive award is significant," the Court has also "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." *Id.* at 581–82, 116 S.Ct. 1589.

In evaluating the damages awards under this guidepost, first, we must determine the proper numbers to compare. Examining the differences in purpose behind the various types of damages a plaintiff may receive provides guidance. "Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'" *State Farm, supra,* 538 U.S. at 416, 123 S.Ct. 1513 (quoting *Cooper Indus., Inc., supra* note 12, 532 U.S. at 432, 121 S.Ct. 1678). The purpose of the treble damages provision of the CPPA is remedial. "By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution." *Id.* "When treble damages are awarded for remedial purposes,

they are not a substitute for punitive damages and the heightened proof requirements for punitive damages do not apply." *Dist. Cablevision Ltd. P'ship v. Bassin,* 828 A.2d 714, 727 (D.C.2003) The remedial purpose of treble damages, as distinguished from punitive damages, is particularly apparent given the fact that the treble damages provision of the CPPA, D.C.Code § 28–3905(k)(1), authorizes the court to treble damages without the plaintiff having to establish anything beyond the CPPA violation itself: "[O]nce it is established that a consumer [has] suffered *any* damage, the CPPA authorizes [the] court[ ] to award treble damages *without further findings.*" *Byrd, supra,* 902 A.2d at 782 (emphasis added) (quoting *Dist. Cablevision, supra,* 828 A.2d at 729). Therefore, "[b]oth the treble damages, which under the CPPA 'serve as a remedial rather than punitive purpose,' and the separate punitive damages" are justified. *Byrd, supra,* 902 A.2d at 782–83. Here, neither the $60,000 award nor the $180,000 award after trebling is a "substantial" award when considering the equity that Wilson lost in her house and the non-economic harm that she suffered.

■ When applying the second guidepost, comparing the punitive award to the harm, we look at both "actual *and potential* damages." *See Gore, supra,* 517 U.S.

at 582, 116 S.Ct. 1589 (emphasis in original); *see also Ayala v. Washington,* 679 A.2d 1057, 1070 (D.C.1996). It follows that, within the context of the CPPA, we would compare the treble figure to the punitive award, because the treble figure reflects the legislature's desire to ensure "full compensation." *Dist. Cablevision, supra,* 828 A.2d at 727. Therefore, the ratio of punitive to treble compensatory damages for each appellant respectively is: 11.1:1 for Abell, 6:1 for Modern Management, and 1.1:1 for Baltimore.[21]

Although the Supreme Court recognized in *State Farm* that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution," the Court also reasoned that the award in each case "must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm, supra,* 538 U.S. at 425, 123 S.Ct. 1513. "Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have

---

**21.** Appellants contend that the proper comparison is of the $60,000 compensatory award to the punitive damages awards, which is why they complain of a 33:1 ratio for Abell, 18:1 ratio for Modern Management, and 3.3:1 for Baltimore. However, even if we were to adopt appellants' view and use the pre-treble figure in the comparison, amounting to a 33:1 ratio—and we do not adopt it—we would still not be persuaded that the punitive damage awards here are unconstitutionally excessive as similar ratios have been upheld by this court and others where the conduct has been sufficiently reprehensible. *See, e.g., Daka, Inc. v. Breiner,* 711 A.2d 86, 102 (D.C.1998) (upholding a 39:1 ratio in an age discrimina-

tion case where the defendant challenged trial judge's denial of the motion for remittitur, claiming that the award was excessive and in violation of "fundamental standards of fairness and due process"); *see also Swinton v. Potomac Corp.,* 270 F.3d 794, 819 (9th Cir. 2001) (upholding a 28:1 ratio where an employer was found liable for failing to address an employee's claims of daily offensive racial harassment in the workplace); *see also Deters v. Equifax Credit Info. Servs., Inc.,* 202 F.3d 1262, 1273 (10th Cir.2000) (upholding a 59:1 ratio in a Title VII sexual harassment claim where the employer's conduct was "particularly egregious").

been difficult to determine." *Gore, supra,* 517 U.S. at 582, 116 S.Ct. 1589. While in *Daka, Inc. v. Breiner* we upheld a 39:1 ratio, concluding that it did not exceed single digit ratios to a *"significant degree"* given the conduct in question, and then in *Daka, Inc. v. McCrae,* we concluded that a ratio of 26:1 *did* exceed single digit ratios to a significant degree, the explanation is found in the compensatory damages that were awarded. Numerically, the ratios differed because the compensatory damages were only $10,000 in *Breiner* and $187,500 in *McCrae,* despite the fact that both were based upon workplace discrimination by the same company. This further evidences the importance of looking beyond the ratio at the specific awards in relation to the conduct for each case.[22]

Other courts applying the *Gore* guideposts have upheld a wide range of ratios. In *EEOC v. Fed. Express Corp.,* 513 F.3d 360, 377 (4th Cir.2008), the Fourth Circuit noted that "[n]otwithstanding [the defendant's] contention, the 12.5:1 ratio between the compensatory and punitive damages awards does not, as a matter of law, render the punitive damages award unconstitutionally excessive." The court reasoned that "the Supreme Court explained in *Gore,* [that] a punitive damages award should bear some reasonable relationship to the corresponding award of compensatory damages, but such a relationship is only one factor in an excessiveness analysis." *Id.* (citations omitted). Some courts have interpreted the "single-digit ratio" language to justify any award less than 10

times the compensatory award. *See, e.g., Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1283–84 (11th Cir.2008) (upholding a 9.2:1 ratio where the conduct was "exceedingly reprehensible"); *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1044 (2003) (a ratio "slightly" more than 7:1 was not unconstitutionally excessive); *Thomas v. Nat'l Legal Prof'l Assoc.,* 594 F.Supp.2d 31, 34 (D.D.C.2009) ("[T]he Court cannot say with 'legal certainty' that a ratio of 6.5:1 between Plaintiff's punitive and compensatory damages violated Defendants' due process rights." (citations omitted)). Others have interpreted the language as a guide, but not binding, particularly when the conduct is reprehensible and the ratio is far below the triple digit ratios reviewed by the Supreme Court. *See Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists,* 422 F.3d 949, 962 (9th Cir.2005); *see also Romano v. U–Haul Int'l,* 233 F.3d 655 (1st Cir.2000) (upholding a 19:1 ratio); see also note 21, *supra.* These cases demonstrate that there is no set number that is indicative of an unconstitutional award, further proving that the ratios involved in this case are not necessarily excessive on their face, as appellants contend. Our focus in evaluating the punitive awards here remains on the reasonableness of the award, considering the degree of reprehensibility of the conduct and the interest in deterring the conduct.

 Our court has recognized, albeit in a different context, that "[a]n exces-

---

22. The 11.1:1 ratio against Abell exceeds a "single-digit" ratio, but not to a "significant degree." *See State Farm, supra,* 538 U.S. at 425, 123 S.Ct. 1513 ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a *significant degree,* will satisfy due process." (emphasis added)); *cf. Gore, supra,* 517 U.S. at 582–83, 116 S.Ct. 1589 (ratio of 500:1 was "breathtaking"); *State Farm, supra,* 538 U.S. at 425–26,

123 S.Ct. 1513 (there is a "presumption" against an award with a ratio of 145:1); *but see TXO, supra,* 509 U.S. at 462, 113 S.Ct. 2711 (a ratio of 526:1 did *not* "jar one's constitutional sensibilities" when considering factors such as "the amount of money at stake, the bad faith of [the appellant], the fact that the scheme employed [ ] was part of a larger pattern of fraud, trickery and deceit, and the petitioner's wealth").

sive verdict is one which 'is beyond all reason, or … is so great as to shock the conscience.' " *Scott v. Crestar Fin. Corp.*, 928 A.2d 680, 688 (D.C.2007) (affirming the trial court's decision to set aside the compensatory award that was "extraordinarily disproportionate to the injuries and losses claimed," after the plaintiff's counsel asked jurors to "send a message" through the compensatory award) (citations omitted).[23] " 'Because the purpose of punitive damages is to punish a tortfeasor and deter future [harmful] conduct, the amount of such damages should be enough to inflict punishment, while not so great as to exceed the boundaries of punishment and lead to bankruptcy.' "[24] *Breiner, supra,* 711 A.2d at 101 (citing *Jonathan Woodner v. Breeden,* 665 A.2d 929, 941 (D.C.1995)). While appellants might plausibly argue that the award against Abell should "raise a suspicious judicial eyebrow," *TXO, supra,* 509 U.S. at 481, 113 S.Ct. 2711, Abell testified that he owned fifty to seventy houses and one-hundred-and-fifty apartment units, and that he and his wife had a combined net worth of approximately $10 million dollars. "[A] punitive damages award must remain of sufficient size to achieve the twin purposes of punishment and deterrence." *Saunders v. Branch Banking and Trust Co. of Va.,* 526 F.3d 142, 154 (4th Cir.2008). The jury was instructed to consider the net worth when determining what damages would be sufficient to serve as a deterrent. After considering all of the evidence presented about appellants' scheme, the jury concluded that the punitive awards were warranted in the amounts specified.

Here, Wilson suffered more than just the financial harm. She not only lost the equity in her house, but she also suffered the emotional harm of being evicted from the home that she had maintained for over twenty-two years,[25] while she was physically, emotionally and financially vulnerable. This is a case where the compensatory award was not very large, compared to the equity that Wilson lost in her house. Therefore, the ratio of punitive to compensatory damages comports with the second *Gore* guidepost and does not indicate that the awards are unconstitutionally excessive.

**Penalties for Comparable Conduct**

▮ We turn now to the third and final *Gore* guidepost which compares the punitive damages award and the "civil or criminal penalties that could be imposed for comparable misconduct." *Gore, supra,* 517 U.S. at 583, 116 S.Ct. 1589. This guidepost is the most difficult to apply, because the excessiveness inquiry must be carefully considered based on the specific facts of the case in question; thus it is hard to draw a comparison to fines imposed in other cases. *See Cooper Indus., supra* note 12, 532 U.S. at 435, 121 S.Ct. 1678. Although this guidepost is given less weight than the first two,[26] it reflects the Supreme Court's concern that punitive damages awards advance a State policy

23. Punitive damages were not awarded, because the trial court struck the plaintiff's claim for punitive damages.

24. Notably, net worth is not a part of the excessiveness challenge analysis. *See Motorola Credit Corp. v. Uzan,* 509 F.3d 74, 85 (2d Cir.2007).

25. In fairness, however, we must recognize that Wilson, in all likelihood, would have lost her house even if the appellants had not contacted her.

26. *See Kemp v. Am. Tel. & Tel. Co.,* 393 F.3d 1354, 1364 (11th Cir.2004) (giving the third guidepost less weight than the first two but reversing the punitive damages award on the ground that the award had no relationship to the amount of harm that occurred).

concern such as protection of the public by deterring the defendant or others from doing such wrong in the future. "The existence of a criminal penalty [has a] bearing on the seriousness with which [the legislature] views the wrongful action," but "the [ ] possibility of a criminal sanction does not automatically sustain a punitive damages award." *State Farm, supra*, 538 U.S. at 428, 123 S.Ct. 1513. In articulating this guidepost, the Supreme Court focused on the fact that "a reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.'" *Gore, supra*, 517 U.S. at 583, 116 S.Ct. 1589 (quoting *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. at 301, 109 S.Ct. 2909 (O'Connor, J., concurring in part and dissenting in part)); see also note 16, *supra*. This demonstrates the concern for ensuring that the punitive award is not arbitrary and is tied to a State's interest in protecting potential victims from defendants' reprehensible conduct.

At the time the award was imposed, there was no statute imposing a fine for the specific conduct at issue. In a broader context, the most relevant civil penalty is found in § 3909(b) of the CPPA, which authorizes the District of Columbia Corporation Counsel to recover up to $1,000 for each violation of § 3904 of the CPPA, which covers unlawful trade practices.[27] Statutory civil and criminal penalties do not always account for the seriousness of the conduct in question. The CPPA does not limit allowable damages and specifically provides that the penalties are "cumulative" and that nothing in the CPPA "shall prevent any person who is injured by a trade practice in violation of a law of the District of Columbia ... from exercising *any* right or seeking *any* remedy to which the person might be entitled...." D.C.Code § 28–3905(k)(2) (emphasis added); *see also Breiner, supra*, 711 A.2d at 102 (noting that the specific D.C. statute under which the defendant was found liable did not limit allowable damages, and upholding the award although it exceeded the maximum fine found in a comparable federal statute because of the need to deter future conduct).

In addition to statutory fines, when applying the third guidepost, we also look to the awards in comparable cases involving similar conduct. *See McCrae, supra*, 839 A.2d at 700. We note that *Byrd, supra*, is the most factually similar case in this jurisdiction, although it does not specifically address the amount of the punitive damage award. There, we affirmed compensatory damages of $148,175 (representing the equity the victim lost in her home), the treble award of $315,026 (after subtracting a set-off of $129,500 from a settlement with a co-defendant), and additional punitive damages where the appellant violated the CPPA by advertising himself as a "foreclosure specialist" under a "scheme to gain title to the [victim's] home for a 'fraction of its value.'" *Byrd, supra*, 902 A.2d at 782.

**27.** Although we do not consider it in our analysis because it became effective after this case was tried, currently, the most relevant statute to the scheme in issue here is the Home Equity Protection Act D.C.Code § 42–2431 (2009 Supp.), which is specifically referenced in the current version of the CPPA at D.C.Code § 28–3904(gg) (2009 Supp.).

Like the CPPA, the Home Equity Protection Act does not limit allowable damages and provides that the remedies available "are cumulative and do not restrict any remedy that is otherwise available." D.C.Code § 42–2434(d). The criminal penalty for violating the Act is a $10,000 maximum fine and/or imprisonment for up to one year for a single violation, and a $50,000 maximum fine and/or imprisonment for up to 5 years for second or subsequent violations. *See* D.C.Code § 42–2435(a) & (b).

Here, Wilson received $60,000 in compensatory damages, which is far less than the $106,000 of equity that she had in her home at the time of closing.[28] The punitive award comports with the third guidepost, notwithstanding that it is given less weight than the first two, since there was no statute imposing a civil fine addressing the conduct at issue or limit on the amount of punitive awards for the conduct at the time. Further, as we have noted, the award here satisfies the first two *Gore* guideposts.

In light of the Supreme Court's jurisprudence, discussed above, and the *Gore* guideposts, which reflect the Court's guiding principles, we conclude that the punitive damages awards entered against the appellants are not grossly excessive or violative of due process.

### III.

### Appellants are entitled to a $40,000 setoff

■■■■■ Appellants' final argument concerning the damages awards is that the trial court erred in not reducing the compensatory damages award of $60,000 by the amount of the $40,000 settlement that Wilson reached with Houlon Berman (the law firm involved in the transaction, with whom Wilson settled). We agree and direct the trial court to apply the setoff to the trebled compensatory award. "The question of 'how to credit the judgment entered upon a jury verdict against a nonsettling defendant with the proceeds a settling defendant paid to the plaintiff' is purely a question of law, which this court reviews *de novo*." *Paul v. Bier,* 758 A.2d 40, 42 (D.C.2000) (citing *Berg v. Footer,*

673 A.2d 1244, 1247 (D.C.1996) (internal citations omitted)).

On appeal, both parties agree that a setoff is appropriate. They disagree, however, on *when* the setoff amount should be subtracted from the compensatory damages. Wilson contends that appellants are entitled to a set-off from the $180,000 trebled compensatory damage award, while appellants argue the amount should be subtracted before trebling (which would reduce the compensatory damages to $20,000). In its order denying appellants' motion for JNOV or for a new trial, the trial court was "unable to determine whether Defendant is entitled to a pro rata credit based on Plaintiff's settlement with the joint tortfeasor, [Houlon Berman] because of the absence of either a judicial determination or a stipulation among the parties that [Houlon Berman] was a joint tortfeasor with the other Defendants." Having reviewed the record, however, we note that the "General Release and Agreement" states that damages recovered in the lawsuit "are hereby reduced by the amount of the consideration paid for this release, or to the extent of the *pro rata* share of [Houlon Berman], whichever is greater" and that Houlon Berman "is to be considered a joint tortfeasor with any other tortfeasors liable to Claimant for damages arising out of the Claims to the same extent as if the Released Party was adjudicated to be a joint tortfeasor by a final judgment of a court of record after a trial on the merits."

■■■■ We have previously recognized that a setoff—"a demand which the defendant has against the plaintiff, arising out of a transaction *extrinsic* to the plaintiff's cause of action"—is applied after the initial damages are multiplied.[29] *District Cablev-*

---

**28.** The equity was calculated by subtracting the mortgage balance of $194,000 from the

fair market value of $300,000 at the time of the transaction.

**29.** In contrast, a recoupment is "a reduction

*ision, supra,* 828 A.2d at 730 n. 21 (emphasis included in original) (citations omitted), *see also id.* at 731 n. 22. Therefore, appellants are entitled to a *pro rata* setoff from the $180,000 treble compensatory award, reducing appellants' liability to $140,000 in compensatory damages.

## IV.

### Wilson is a "consumer" under the CPPA

 We are unpersuaded by appellants' contention that the trial court erred in submitting to the jury, as a question of fact, the issue of whether Wilson qualified as a "consumer" within the meaning of the CPPA, the statute under which Wilson was able to recover both treble and punitive damages.[30] Appellants argue that Wilson's role as a landlord precludes her from being considered a "consumer," because her rental of a room in the house shows that the house was not her primary residence and thus the house was not a "consumer good" because it was not "primarily for personal, household, or family use." Appellants' argument is misplaced. The question of whether the home was Wilson's primary residence and whether her house was used *primarily* for "personal, household, or family use" are two different inquiries. *Cf. Ford v. ChartOne,* 908 A.2d 72, 83 (D.C.2006) (reasoning that "[a] motive may be pecuniary and still be personal").

 "Consumer" is defined in the CPPA, D.C.Code § 28–3901(a)(2), to "mean[ ] a person who does or would purchase, lease (from), or receive consumer goods or services including a co-obligor or surety, or a person who does or would provide the economic demand for a trade practice; as an adjective, 'consumer' describes *anything,* without exception, which is primarily for personal, household, or family use[.]" (emphasis added). The purpose of the CPPA is to protect consumers from a broad spectrum of unscrupulous practices by merchants, therefore the statute should be read broadly to assure that the purposes are carried out. *See District Cablevision, supra,* 828 A.2d at 722–23 (citation omitted). Thus, the statute should be read in conjunction with other provisions within the CPPA which clarify the meaning of "primarily for personal, household, or family use." D.C.Code § 28–3901(a)(2). For example, "goods and services" under the statute are defined as "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes consumer credit, franchises, *business opportunities,* real estate transactions, and consumer services of all types." D.C.Code § 28–3901(a)(7) (emphasis added). As we have previously noted, "the specific inclusion of 'franchises' and 'business opportunities' in this definition demonstrates unequivocally that the consumer in a consumer transaction is allowed to have a financial motive." *Ford, supra,* 908

---

or rebate by the defendant of part of the plaintiff's claim because of a right in the defendant arising out of the same transaction." *District Cablevision, supra,* 828 A.2d at 730 n. 21.

30. This argument is waived because trial counsel agreed to submit the consumer issue to the jury before trial and did not object to the jury instructions.

Court: Well that means you're going to withdraw your element that you don't think is applicable in terms of her being considered a consumer since that was the only basis for your argument for consumer as to whether she would be a consumer or not. Defense Counsel: "We're not going to withdraw that argument. We're going to withdraw insisting that that (sic) be decided—we're going to agree that that (sic) can be submitted to the jury."

A.2d at 83; *see also Weschler & Son, Inc. v. Klank,* 561 A.2d 1003, 1005 (D.C.1989) (holding that a person purchasing an antique from an auction was engaged in a "consumer transaction" within the meaning of the CPPA).

Given the evidence presented, the jury could reasonably have concluded that Wilson entered into the transaction to prevent foreclosure so that she could continue to live in the house that she had owned for over twenty years. In the alternative, the jury could have concluded that Wilson entered into the transaction to prevent foreclosure on her home and to continue to rent the house to tenants, earning income from a house that she owned for over twenty years. In either conclusion, one thing remains the same: the purpose for which Wilson entered into the transaction was to maintain her ownership of the home. Therefore, the purpose of the transaction was personal to Wilson; she contracted with the appellants not as a landlord in order to gain profit, but as a consumer seeking to "receive" their services as self-proclaimed "foreclosure specialists" and "money lenders," to help her maintain ownership of her house. We applied a similar analysis in *Browner v. District of Columbia,* where we considered whether the Loan Sharking Act, D.C.Code § 26–901, applied to a defendant who claimed that he had never loaned money to the plaintiff. 549 A.2d 1107, 1114 (D.C. 1988) (substance, not form, of the transactions was critical in determination that they were loans within the meaning of the Loan Sharking Act).

Since, the evidence presented during trial on the consumer issue was contested, the outcome depended upon weighing the evidence and determining the credibility of the witnesses at trial—functions which are squarely within the purview of the trier of fact. Further, because the jury instruction given by the trial judge on the consumer question quoted directly from the statute, the jury was properly instructed on the correct legal framework with which to determine the facts and evaluate the disputed evidence.

██ Therefore, we conclude that given the disputed facts presented at trial, the issue of whether Wilson qualified as a "consumer" under the CPPA was a question of fact properly submitted to the jury and the verdict is supported by the evidence.[31]

## V.

We conclude, for all of the reasons set forth above, that the punitive damages awards against the appellants were not unconstitutionally excessive. In addition, we conclude that the trial court did not

---

**31.** We reject appellants argument that the jury verdict was against the weight of the evidence. The trial court did not err in denying appellants' motion for JNOV because a reasonable jury, viewing the evidence in the light most favorable to Wilson, could have found appellants liable for common law fraud and statutory fraud under the CPPA. *See District of Columbia v. Cooper,* 445 A.2d 652, 655 (D.C.1982) (en banc); *see also Liu v. Allen,* 894 A.2d 453, 459 n. 10 (D.C.2006) (citations omitted) The jury was presented with evidence that appellants represented themselves as "Money Lenders," tendered Wilson a host of confusing documents with improper titles, told Wilson that the sale documents were a "legal fiction" after she told them that she did not want to sell her house, and then induced her to enter into a lease/buy-back agreement that they knew she could not afford. Wilson also only received a $5,000 check for the house and remained liable for the mortgage debt. A reasonable juror viewing this evidence in the light most favorable to Wilson could have reached a verdict in Wilson's favor on both the common law fraud and CPPA claims. *See Fort Lincoln Civic Ass'n., Inc. v. Fort Lincoln New Town Corp.,* 944 A.2d 1055, 1073–74 n. 22 (D.C.2008) (citations omitted); *see also* D.C.Code § 28–3904(e) and (r).

err in initially permitting Wilson to pursue her RICO claims, as the record does not support appellants' claims that the jury improperly inflated the punitive awards because of the RICO evidence. The appellants are entitled to a *pro rata* setoff from the $180,000 trebled compensatory award in the amount of the $40,000 settlement with the co-defendant law firm Houlon Berman, which reduces the compensatory damage award to $140,000. Finally, the trial court did not err in submitting the question of whether Wilson was a consumer under the CPPA to the jury as a question of fact, and the jury verdict finding appellants liable for common law fraud and for violations of the CPPA was not against the weight of the evidence. We affirm on all issues, but remand for the trial court to reduce the treble compensatory damages by the setoff amount to $140,000.

*So ordered.*

THOMPSON, Associate Judge, with whom SCHWELB, Senior Judge joins, concurring:

I join the opinion of the court because Judge Blackburne–Rigsby's detailed analysis has persuaded me that the punitive damages awards in this case were not so large as to be constitutionally excessive. I write separately, however, to explain why, on the particular facts of this case, I am left feeling that the size of the punitive awards amounts to an unwarranted windfall for appellee Wilson (who was poised to lose her home, in which she had about $100,000 in equity, even before appellants became involved, and who recovered or stands to recover from appellants over $3 million through the punitive damages awards, in addition to $140,000 in compensatory damages).

There can be no dispute that appellants recognized and preyed on Wilson as a financially distressed and vulnerable homeowner, and for that they richly deserve the sting of a punitive damages judgment. But the record also indicates that Wilson was willing to execute documents that she knew mis-described the transaction as she understood it. As the opinion of the court recounts, Wilson was asked to sign documents whose title "indicated a sale of her home when she intended only to obtain a loan to stop the foreclosure." See *ante* at 43. She signed the documents upon being informed that the "sale was only a 'legal fiction' . . . necessary to speed up the process." *Id.* Apparently, Wilson was willing to agree without protest to a deceptive charade in order to obtain the funds she needed. If that is the case, then, in my view, her complicity somewhat diminishes the comparative reprehensibility of appellants' conduct (though, I agree, not enough to entitle appellants to escape entirely the punitive damages awards). There is also the fact (which is of particular note in the wake of the so-called sub-prime mortgage crisis involving not only predatory lenders but also borrowers who irresponsibly took out loans they knew they would be unable to repay) that Wilson told appellants she could afford to pay $1,800 per month and then, for whatever reason, "failed to make *any* of the . . . payments." See *ante* at 43 (emphasis added). I believe courts would do well to consider instructing juries, in circumstances such as those here, that notwithstanding the deterrent purpose of punitive damages, victim complicity is a factor which may be considered in assessing such damages.

That is not the state of our law, however. The size of the punitive awards was for the jury to determine under the standards prescribed, and so I agree that the awards must stand undisturbed.